ROSE KAPLAN, Appellant, v. JOSEPH KAPLAN, Appellee.

No. 40648.

DECEMBER 16, 1931.

Francis, Maley, Witmer & Todd, for appellant.

Hallagan, Fountain & Stewart, for appellee.

PER CURIAM: The accident in which the plaintiff received her injuries occurred near Atlantic on July 9, 1928. The plaintiff is the adult daughter of the defendant, engaged as a stenographer and living in the home of her father and stepmother in Des Moines, but paying for her board and room. On Saturday, July 7th, while the plaintiff was at her place of work, her father called her by phone and invited her to go with him to Omaha over the week-end to visit some relatives. The plaintiff consented. Sometime after noon, the father, accompanied by the daughter, left Des Moines for Omaha, but on account of the approaching of a storm they were stopped in their journey at Oakland, where they remained all night. Sunday morning they continued their journey to Omaha, but on account of the rain the evening before, the roads were quite muddy. They put on chains, and arrived in Omaha about two o'clock P. M. They visited with their relatives and friends until about midnight. They started on their return trip about 6:30 Monday morning, July 9th, the day of the accident. By this time the sun had dried the roads pretty well and they were not rough. En route from Omaha to Atlantic plaintiff felt tired, and when the father stopped at the latter city for gasoline, both she and her father got out of the car. Upon leaving Atlantic, at the suggestion of the defendant, the plaintiff took the back seat of the car, and

almost immediately fell asleep. It was a nice warm day, and they faced the sun as they proceeded easterly from Atlantic. Plaintiff's next conscious moment was in a hospital at Atlantic. The accident occurred upon a dirt road seven or eight miles east of Atlantic. The road had been dragged that morning, and there were small clods in the road. There was only one eyewitness to the accident, who was approaching from the east, and who testified:

"I was about sixty rods from the Kaplan car and driving toward it. When I saw the Kaplan car, it was swinging across the road, and turned over. The highway runs east and west, and Kaplan seemed to be a little to the left-hand side of the road, coming east, and his car was turned across the road, like he was trying to get to his side of the road. I seen the side of the car when it was rolling over, just as I came over the hill, when I could see the car right plain. The next thing I seen, it was rolling. More of the car appeared to be north of the center of the road going east, then it was headed toward his side of the road. He had it cramped a little bit, to get on his side of the road. Headed back to the south side of the road. He didn't get back to the south side of the road. He rolled off the north side of the bank on the north side. It left the road and finally came to a stop on the north side of the road, and was then headed west, the same direction in which I was going. I saw the car turn over, but do not know how many times. I was too excited to count it. I don't know whether it turned over after it hit the bank or not. It must have turned over in the road. I drove up and stopped at the car. I saw Mr. Kaplan in the car. * * * The car was pretty badly wrecked on the inside. * * * Prior to the time the Kaplan car reached the edge of the road, it turned over in the middle of the highway. It was about the center of the north highway where the top struck the ground. I assisted in putting her (the plaintiff) in the ambulance. After they left, I made investigation of the marks where they turned over in the road to see how it turned over. It was kind of a mystery how it happened to be turned west. Where it hit the hard road, it didn't make much of a dent. You could see it nicely, and it seemed like when it got turned over, it turned the car clear on around, and the momentum of it took it down the bank. I did not see their car long enough to judge

how fast it was going. * * * It is hilly country through there. I was about sixty rods away from the Kaplan car when I first saw it. There was little clods in the center of the road. They had dragged it that morning. Those clods out in the road were all over the bottom there. It is a yellow clay and it makes hard clods. When I first saw the car, the front part of it was in the center of the road and the car was on an angle. It was No. 32 highway. The road on that day was in its usual and ordinary condition. It was a fair road. I did not have any difficulty in driving over it."

The plaintiff testified:

"I took no part in the operation of the automobile during the entire trip. I had no control over the automobile at any time. My father owned the car, and it was a Studebaker, five-passenger Sedan."

The father, subpoenaed as a witness by the plaintiff, testified:

"I owned the automobile which was wrecked in the accident on the 9th day of July, 1928, near Atlantic. Rose Kaplan did not have any interest or ownership in it. She did not have any control over the automobile as to where it was going or in what direction it was going in that trip."

As to the cause of the accident, the plaintiff testified:

"The first conversation I had with my father after the accident on July 9th, was in the hospital. His room was about two doors from mine, and when I regained consciousness, I called to him and asked what had happened. He said he must have fallen asleep at the wheel and caused the accident. He said he was rather tired and had fallen asleep, and inasmuch as we were facing the east, the sun was in his eyes, and he supposed that helped make him more drowsy."

The defendant's wife testified:

"I had a conversation with Mr. Kaplan when I arrived at the hospital in Atlantic, Monday, July 9th. I asked him what happened, and he said he was tired, and didn't sleep the night before much, and he was sleepy and fell asleep."

650

The defendant testified:

"The only thing I can tell is, I remember only one piece of road after we left Atlantic. There is a high bridge, and I remember crossing that. After I crossed that, about 2½ miles down there, I must have fallen asleep. * * * The only thing I remember is waking up in the hospital."

Both the appellant and appellee were severely injured as a result of the accident.

The car belonged to the appellee. He drove, managed and controlled it. Consequently, the appellant was his guest. See Stilson v. Ellis, 208 Iowa 1157, at 1165; Cram v. City of Des Moines, 185 Iowa 1292. This is conceded by the parties.

The motion of the defendant for a directed verdict was based on two grounds, to wit: (1) That the plaintiff was, as a matter of law, guilty of contributory negligence; and (2) that the defendant, as a matter of law, was not guilty of recklessness, within the meaning of the statute. This motion was sustained.

Our statutory law, Section 5026-b1, Code, 1927, provides:

"The owner or operator of a motor vehicle shall not be liable for any damages to any passenger or person riding in said motor vehicle as a guest or by invitation and not for hire, unless damage is caused as a result of the driver of said motor vehicle being under the influence of intoxicating liquor or because of the reckless operation by him of such motor vehicle."

In Siesseger v. Puth, 213 Iowa 164, we made somewhat definite pronouncements relative to the proper construction to be placed upon said statutory enactment. We there said:

"As recklessness is more than negligence, it follows that contributory negligence is not an element to be considered or dealt with, either by pleading, proof, or instruction of the court, in cases brought under this statute."

See Neessen v. Armstrong, 213 Iowa 378. Therefore, the first ground of the motion for a directed verdict should have been overruled.

We now proceed to a consideration of the second ground of said motion. Would the court be justified in permitting a

jury to find from the evidence as hereinbefore set out that the defendant-father was guilty of recklessness within the meaning of the law? We answer in the negative. The appellant calls our attention to, and somewhat stresses, the provisions of Section 1, Chapter 128, Acts 43 G. A., which was enacted as a substitute for Section 5028, Code, 1927, and where the legislature specifies certain acts as constituting reckless driving. This legislation took effect July 4, 1929. The accident occurred July 9, 1928. Therefore said enactment has no bearing upon the rights of the parties to this litigation. For the construction placed by us upon said section, see Neessen v. Armstrong, 213 Iowa 378.

The fact that the father permitted sleep to overcome him and drove the car while asleep is the only proposition argued by the parties as the cause of the accident. There is no evidence of any other cause. Can it be said that a person, while driving along the highway, who is involuntarily overcome by sleep is guilty of reckless operation of the automobile within the meaning of the law? We think not. This case presents an unusual state of facts, and there is a paucity of adjudicated cases relating to the question of sleep upon the proposition herein involved. In Bushnell v. Bushnell (Conn.), 131 Atl. 432, 44 A. L. R. 785, the wife brought suit against her husband to recover damages for personal injuries received by her while riding with her husband, which injuries were received as the result of her husband's operating the car while asleep. The wife's cause of action was founded on negligence. We have held in Maine v. James Maine & Sons Co., 198 Iowa 1278, that a wife cannot recover against the husband for damages caused by his negligence, but this does not destroy the value of the Bushnell case as a pronouncement on the propositions involved in the instant case. It was held in that case that the question of the husband's negligence was for the determination of the jury, the court saying:

"While the condition of mind of the person doing harm is not to be regarded in determining liability within the proper field of the doctrines of negligence, yet those doctrines of necessity presuppose that the person whom it is sought to charge is capable of sense perceptions and judgment. * * * Upon this basis, by the great weight of authority the insane person, who

is wholly irresponsible, is not chargeable with liability upon the ground of negligence. * * * Certainly in all reason he who, stricken by paralysis, or seized by an epileptic fit, still continues with his hands upon the wheel of the automobile he was driving, and, unconscious, so directs it as to cause its collision with another, cannot be held negligent for the way in which he controlled it; and no more can he who exercises a like direction after he has been overtaken by sleep. In such a case, the question must be, Was the defendant negligent in permitting himself to fall asleep? Helton v. Alabama Midland R. Co., 97 Ala. 275, 284, 12 So. 276. The defendant argues that, granted that premise, then he cannot be charged with negligence because no man can tell when sleep will fall upon him. It is probably true that one cannot ordinarily fix with certainty upon the precise moment when he lapses into unconsciousness, but it is not true that ordinarily sleep comes unheralded. Purves Stewart, in his 'Diagnosis of Nervous Diseases,' (3d Ed.) p. 423, thus describes the chief phenomena of ordinary healthy sleep: 'Firstly, there is diminution and then loss of conscious recognition of ordinary stimuli, such as would ordinarily attract our attention, whether these stimuli be derived from the outer world, or from within the sleeper's own organism. There is also, as consciousness is becoming blunted, a characteristic and indescribable sense of well-being. Voluntary movements become languid and ultimately cease and the muscles of the limbs relax. Meanwhile there develops double ptosis or drooping of the eyelids; the pupils contract; the respiratory movements become slower and deeper, the pulse is slowed, the cutaneous vessels dilate to a slight extent and the general temperature of the body falls, whilst many processes of metabolism, such as those of digestion and of certain secretions are retarded.' * * * In any ordinary case, one cannot go to sleep while driving an automobile without having relaxed the vigilance which the law requires, without having been negligent. It lies within his own control to keep awake, or cease from driving. And so the mere fact of his going to sleep while driving is a proper basis for an inference of negligence sufficient to make out a prima facie case, and sufficient for a recovery, if no circumstances tending to excuse or justify his conduct are proven. * * * If such circumstances are claimed to have been proven,

it then becomes a question of fact whether or not the driver was negligent; and, in determining that issue, all the relevant circumstances are to be considered, including the fact that ordinarily sleep does not come upon one without warning of its approach.''

It will be noted that the cited case was based not upon recklessness, but only on negligence. The plaintiff in the instant case in argument asserts:

''No, it was not recklessness for him (the father) to drive while asleep, for when asleep he had no conscious thought—he was as helpless as the man suddenly stricken by paralysis.''

But the appellant argues that the father was reckless for going to sleep or permitting himself to be overcome by sleep. While he may have been negligent, this does not constitute recklessness within the meaning of the statute. In Siesseger v. Puth, supra, we made the following pronouncement:

''Unless the word 'reckless' in said Chapter 119 (Section 5026-b1, Code, 1927) means more than negligence, then the statute is inconsistent and nugatory. By no rule or reason can it be inferred that the Legislature of the State of Iowa, in passing said Chapter 119, 'marched uphill and then marched down again.' To hold that 'reckless' means negligent is to charge the Legislature with doing just that and nothing more, so far as said Chapter 119 is concerned. It is equivalent to saying that the Legislature first relieved the operator of his liability for negligence and then, by exception No. 2 in said chapter, held him liable for negligence. * * * As 'negligence' is no longer classified in this state, it follows that 'reckless operation,' as found in said Chapter 119, means something other than and beyond 'negligence.' * * * In light of the circumstances under which said Chapter 119 was passed, it is apparent, we think, that the Legislature intended the word 'reckless' therein to mean 'proceeding without heed of or concern for consequences.' To be 'reckless,' one must be more than 'negligent.' ''

For the father's act in operating the car while asleep, he was no more accountable than he would have been, had he been suddenly seized with a fit of epilepsy. The fact that he was

tired and facing the east sun and went to sleep cannot and does not raise any negligence there may have been in said act to the level of recklessness. His unconscious conduct while asleep, or semiconscious conduct while going to sleep, or the mere fact that he permitted sleep to overcome him, do not evince a heedless disregard of the rights of the daughter.

By so holding under this record, we do not decide that there might not be facts and circumstances in some other case amounting to recklessness because the driver of an automobile went to sleep at the wheel.

The judgment of the trial court must be and the same is hereby affirmed.—Affirmed.

All Justices concur.