## HUFFMAN v. BUCKINGHAM TRANSP. CO. OF COLORADO, Inc.

### No. 1642.

Circuit Court of Appeals, Tenth Circuit.
Sept. 15, 1938.

J. M. Roushar, of Torrington, Wyo. (M. A. Kline, of Cheyenne, Wyo., on the brief), for appellant.

Cecil M. Draper, of Denver, Colo. (W. A. Alexander and Louis C. Gerding, Jr., both of Denver, Colo., on the brief), for appellee.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

This action was commenced in district court of Goshen County, Wyoming, against Buckingham Transportation Company and the Union Pacific Railroad Company by Walter D. Huffman, administrator of the estate of Clarence D. Huffman, deceased, to recover damages by reason of his death, alleged to have been caused in the state of

Wyoming through the negligence of the transportation company and the railroad company, and duly removed to the United States District Court for the District of Wyoming.

A demurrer interposed by the railroad company having been sustained, it was eliminated as a party defendant, the action proceeding against the transportation company.

At close of the evidence, the transportation company duly interposed a motion for a directed verdict in its favor which was sustained, exceptions being saved. From the judgment rendered thereon in its favor, this appeal was prosecuted.

Plaintiff's intestate, Clarence D. Huffman, being a gratuitous guest in defendant's truck at time of accident, this case rests upon Section 72-701, Revised Statutes of Wyoming, enacted in 1931, not having been construed by Supreme Court of said state:

"No person transported by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have a cause of action for damages against such owner or operator for injury, death or loss, in case of accident, unless such accident shall have been caused by the gross negligence or wilful and wanton misconduct of the owner or operator of such motor vehicle and unless such gross negligence or wilful and wanton mis-conduct contributed to the injury, death or loss for which the action is brought."

In Oxenger v. Ward, 256 Mich. 499, 240 N.W. 55, as to such guest statute (Public Acts Mich. 1915, No. 302, Sec. 29, amended by Act 19, Public Acts Mich. 1929, Sec. 4648, Comp.Laws 1929), the court said [page 57]:

"The very purpose of the guest act was to absolve an owner or driver from liability for negligence, except where he is guilty of wanton and willful misconduct or gross negligence. Upon examination of the meaning of the term 'gross negligence' as judicially defined prior to the enactment of the guest act, and upon consideration of the very purpose for which this statute was enacted, and a careful reading of the statute and the correlation therein of the term with that of 'wanton and wilful misconduct,' we must conclude that the term 'gross negligence' means such a degree of recklessness as approaches wanton and willful misconduct."

In Naudzius v. Lahr, 253 Mich. 216, 234 N.W. 581, 74 A.L.R. 1189, decided on Jan. 23, 1931, prior to the borrowing and adopting of the statute by Wyoming, its constitutional validity was sustained, same construction announced as afterwards re-announced in Oxenger v. Ward, supra, and later in Grabowski v. Seyler, 261 Mich. 473, 246 N.W. 189, wherein it is said [page 190]:

"The term 'gross negligence,' as employed in this statute [guest statute], does not mean something of less degree than willful and wanton misconduct. See Oxenger v. Ward, 256 Mich. 499, 240 N.W. 55."

In 1933 the Legislature of South Dakota enacted its guest statute (Chapter 147, Laws 1933), taking same from Michigan.

In Melby v. Anderson, 64 S.D. 249, 266 N.W. 135, it is said [page 136]:

"* * * it appears clear beyond question, not only that our Legislature adopted the Michigan statute, but also that our Legislature did not adopt any other statute," and held that:

"Words 'gross negligence' in automobile guest statute do not mean merely more or greater negligence than word 'negligence' alone implies, but are substantially synonymous with phrase 'willful and wanton misconduct,' which means conduct transcending negligence, different in kind and characteristics and partaking of nature of deliberate and intentional wrong to appreciable extent," and that:

"To find automobile driver guilty of gross negligence or willful and wanton misconduct within automobile guest statute, jury must find that he intentionally did something he should not have done or intentionally failed to do something he should have done under such circumstances that he can be said to have consciously realized that his conduct would probably produce precise result which followed and bring harm to his guest."

Such construction of said guest statute in Michigan and South Dakota has been adhered to by their respective appellate courts without modification or variation.

Automobile guest statutes have been enacted in the additional states: California, Statutes 1931, p. 1693 (amending Statutes 1929, c. 787, p. 1580); Colorado, '35 C.S.A., Vol. 2, c. 16, Section 371, Session Laws 1931, p. 460, Section 1; Connecticut, Public Acts 1927, c. 308; Delaware, Laws, vol. 36, c. 270; Idaho, Laws 1931, c. 135; Illinois, Laws 1931, p. 779, Smith-Hurd Ann. St. c. 95½, § 58; Indiana, Acts 1929, p. 679, c. 201; Iowa, Acts 1927, c. 119 (Iowa Code 1927, Section 5026-b 1); Kansas,

Laws 1931, c. 81; Kentucky, Acts 1930, c. 85; Montana, Laws 1931, c. 195; Nebraska, Laws 1931, c. 105; North Dakota, Laws 1931, c. 184; Ohio, Gen.Code, Section 6308-6; Oregon, Laws 1929, c. 401, p. 550 (replacing Laws 1927, c. 342, p. 448); South Carolina, Acts 1930, p. 1164; Texas Acts 1931, p, 379, c. 225 (Vernon's Ann.Civ.St. art. 6701b); Vermont, Public Acts 1929, p. 87, No. 78.

No guest statute existing at time of said enactment in Michigan, Wyoming, or South Dakota corresponds in language with either the parent statute in Michigan or the subsequently adopted statutes in Wyoming and South Dakota.

In Napier v. Mooneyham, Tex.Civ.App. 1936, 94 S.W.2d 564, the court construed the meaning of the Texas guest statute which, whilst not identical with that of Wyoming, liability being predicated only on the driver's "heedlessness or his reckless disregard of the rights of others," and reviewed guest statutes of other states using the same or similar terms and held that the term "embodies the same concept * * * as that embraced in the· * * * definition of gross negligence." [page 567.]

See, also,' Fly v. Swink, 17 Tenn.App. 627, 69 S.W.2d 902.

In Montana and Texas, with guest statutes, it was held that neither does a violation of traffic regulation or driving at excessive speed, nor failure to observe the law of the road, without more, constitute gross negligence. Fly v. Swink, 17 Tenn.App. 627, 69 S.W.2d 902; Napier v. Mooneyham, Tex. Civ.App., 94 S.W.2d 564, supra; Cowden v. Crippen, 101 Mont. 187, 53 P.2d 98, and authorities infra. In states not having a guest statute, the weight of authority sustains the same rule. Riggles v. Priest, 163 Wis. 199, 157 N.W. 755, and Theby v. Wisconsin Power & Light Co., 197 Wis. 601, 222 N.W. 826, 223 N.W. 791; 45 Corpus Juris, p. 67b, sec. 48b.

The Michigan guest statute was applied in accordance with the holding of the Michigan Supreme Court by the Ohio appellate court on November 23, 1931. De Shetler v. Kordt, 43 Ohio App. 236, 183 N.E. 85.

In Dakins v. Black, Sebring v. Black, 195 Minn. 91, 261 N.W. 870, and Thorsness v. Woltman, two cases, 198 Minn. 270, 269 N.W. 637, the accident in each case happening in South Dakota where, in addition to its guest statute being under consideration, the lawful speed of cars on the highways of that state was limited to 40 miles per hour. In the former case evidence was held to be insufficient to sustain a finding of gross negligence of driver of automobile by guest for injuries sustained when traveling at speed of 50 to 55 miles per hour after dark when driver collided with unlighted truck parked on highway, due to skidding in loose gravel (Rev.Code S.D.1919, Section 801, as amended by Laws 1933, c. 147), and in the latter (Thorsness v. Woltman, two cases), for injuries by guest against host, as to gross negligence, within meaning of South Dakota guest statute (Laws S.D.1933, c. 147), the syllabus by the court being as follows:

"Applying the interpretation of the South Dakota guest passenger statute (Laws 1933, c. 147) to the facts most favorably stated for plaintiffs in the cases at bar, we find that there is nothing in the record to justify a jury in finding that the defendant was guilty of gross negligence within the meaning of that statute as so interpreted." Following Melby v. Anderson, 64 S.D. 249, 266 N.W. 135, 137.

The terms gross and· wanton and wilful, when used in relation to misconduct which constitutes violation of a statute or municipal ordinance enacted to promote the public safety and which is often called negligence per se, without more, have no legal significance which imports other than simple negligence or want of due care, and are not equivalent to wilful or wanton or gross negligence as used in the Michigan, South Dakota and Wyoming guest statutes. Findlay v. Davis, 263 Mich. 179, 248 N.W. 588; Boos v. Sauer, 266 Mich. 230, 253 N.W. 278; Van Blaircum v. Campbell, 256 Mich. 527, 239 N.W. 865; Devlin v. Morse, 254 Mich. 113, 235 N.W. 812; Whiddon v. Malone, 220 Ala. 220, 124 So. 516; Bailin v. Phoenix, 102 Cal.App. 117, 282 P. 421; Bushnell v. Bushnell, 103 Conn. 583, 131 A. 432, 44 A.L. R. 785; Kaplan v. Kaplan, 213 Iowa, 646, 647, 239 N.W. 682; Krueger v. Krueger, 197 Wis. 588, 222 N.W. 784; De Shetler v. Kordt, supra; Dakins v. Black, supra, and Thorsness v. Woltman, supra.

In Balcer v. Pere Marquette Ry. Co., 266 Mich. 538, 254 N.W. 198, the accident occurring after dark, it is said [page 199]:

"The speed was excessive because it was above the statutory limit. Excessive speed alone is only ordinary negligence."

Neither Massachusetts, Georgia, New Jersey, Virginia, Washington nor Wiscon-

sin having a guest statute, the appellate courts of those states have ruled to the effect that a gratuitous guest has no right of action against his or her host for damages for injuries occasioned in an automobile accident unless caused by the gross negligence of the owner or operator of said automobile. McKenna v. Smith, 275 Mass. 149, 175 N.E. 474; Altman v. Aronson, 231 Mass. 588, 121 N.E. 505, 4 A.L.R. 1185; Massaletti v. Fitzroy, 228 Mass. 487, 118 N. E. 168, L.R.A.1918C, 264, Ann.Cas.1918B, 1088; Epps v. Parrish, 26 Ga.App. 399, 106 S.E. 297; Peavy v. Peavy, 36 Ga.App. 202, 136 S.E. 96, 97; Hall v. Slaton, 40 Ga.App. 288, 149 S.E. 306; Hennig v. Booth, 132 A. 294, 4 N.J.Misc. 150; Faggioni v. Weiss, 99 N.J.L. 157, 122 A. 840; Young v. Dyer, 161 Va. 434, 170 S.E. 737; White v. Gregory, 161 Va. 414, 170 S.E. 739; Blood v. Austin, 149 Wash. 41, 270 P. 103; Warren v. Bowdish, 166 Wash. 217, 6 P.2d 593; Craig v. McAtee, 160 Wash. 337, 295 P. 146, and Grandhagen v. Grandhagen, 199 Wis. 315, 225 N.W. 935.

■ The conclusion is reached that the legislature of Wyoming adopted its guest statute from Michigan, with knowledge of its prior construction, and that such construction by the Supreme Court of that state should be adhered to in this case.

The transportation company was engaged in the operation of motor trucks carrying freight and express between Cheyenne and Torrington, Wyoming, the route of its tracks between said points over U. S. Highway 85 crossing a branch line or spur of the Union Pacific Railroad at a place about 11 miles southwest of Torrington, known as Springer Crossing. The highway was oiled, such portion being about 18 feet in width, with the shoulders included it being in width from 21 to 22 feet. At said point, said highway is over level country, running in a northerly and southerly direction, said branch line of said railroad intersecting said highway at almost right angles, the railroad running in a northeasterly and southwesterly direction.

A few minutes before the accident, at about 6 o'clock P. M. on November 25, 1934, a Union Pacific freight train, made up of 45 gondola beet cars, all substantially alike, pulling across the highway, stopped, totally blocking same, it being the intention of the freight crew to pick up a string of empty cars on a side track at that point. The engine of the train faced slightly to the south in a westerly direction, standing 33 car lengths west of the crossing, the caboose being 15 cars east of the crossing. The engine had not been uncoupled from the train, nor had flares, lights, or other warning signals been placed on the crossing. Testimony of the brakeman was that the cars were 33 feet long, and that of the conductor that they were 40 feet long. According to the brakeman, the locomotive was 990 feet west and the caboose 495 feet east of the crossing, and as to the conductor, the locomotive was 1,200 feet west and the caboose 600 feet east of the crossing. The west end of the beet car which was struck had stopped at about the center of the highway. The space between freight cars when coupled together varies from 3 or 4 feet in case of box cars to as much as 8 or 10 feet as to flaring type beet cars.

About the time the engine of the train passed over the crossing an automobile coming from the north stopped for the train to pass. As the train came to a standstill the headlights of the automobile projected in a southerly direction, from which defendant's truck was approaching, and shone through the space between the car which was struck and the car immediately ahead of it to the west.

Plaintiff admits there is no evidence of any signs warning motorists on the highway that there was a railroad crossing at that particular point, but suggests that the court should take judicial notice of such suppposed fact that such crossing signs are located on all U. S. highways where highways cross railroad tracks on grades. This is controverted for the reasons (1) that the presence of such a warning sign and the nature of same was and is an important element in plaintiff's case, and that if such a sign were present it was plaintiff's duty to prove that fact, and (2) the map of the crossing drawn by plaintiff's witness, Wilcox, included in the record, covering many of the details surrounding the point of the accident fails to show the presence of a railway crossing sign or its location, indicating that no such sign was present, and (3) in addition, plaintiff's original petition filed against both the present defendant and the Union Pacific Railroad Company contains a statement, verified by the plaintiff, that "the defendant Union Pacific Railroad Company negligently and carelessly failed to have installed upon the right-hand side of said highway and south of said crossing, a reasonable distance from

said railroad crossing, a disk or sign warning travelers on said highway of the near approach to the said railroad crossing."

Evidence concerning the speed at which the Ford V-8 truck was traveling prior to the collision is indefinite. That of the three trainmen of the Union Pacific train relating to the collision, originally interested in placing all the blame for the accident on the driver (Jamison) of the truck that they might be relieved from responsibility, is as follows: The brakeman, stationed 100 to 200 feet to the east of the caboose for the purpose of flagging trains to the rear, and from 500 to 800 feet from the point of the accident, testified that "by the sound of the motor" he thought the truck was "coming awfully fast," and that he "would say that the truck was going close to sixty miles an hour."

The conductor's evidence was that he was 14 car lengths or 462 feet to 560 feet east of the crossing (distance depending on whether the cars were 33 or 40 feet long) and that all he "could tell as to the speed the car was traveling was from the sound and the vibrations of the motor," and that he "would say it was traveling between fifty and sixty miles an hour." That of the fireman was that he was sitting in the cab of the caboose, about 30 cars west of the crossing, and from 1000 to 1300 feet west of the point of the collision, and that "by the sound of the motor, the truck was going fast. I would estimate that it was moving around sixty miles an hour."

The evidence of a deputy sheriff was that immediately after the collision he had investigated the accident, and that the speedometer on the truck was registered at 51 miles per hour, no attempt being made by him to describe the mechanism of the speedometer. He stated specifically that he did not know "the causes which make them (speedometers) set," being limited by the court to the bare statement of what the speedometer registered.

The brakeman thought the train had been stopped about two minutes prior to the collision. How he reached the point 100 to 200 feet to the rear of the caboose is not disclosed, though he testified that he was standing at this point when the truck "topped the hill," the deputy sheriff testifying that then it was over a mile from the point of the collision. The conductor said he first saw the truck when it was about a half mile away, being then on the west platform of the caboose, and the train had

not stopped. The truck was less than 500 feet from the crossing when the train stopped. The conductor had time to walk less than a car length, which he testified was 40 feet, from the time the train stopped until the collision occurred, and he thought the train had stopped not more than a minute or a minute and a half before the accident occurred. The fireman saw the truck as it was coming over a hill which he said was about a half mile or possibly a mile from the crossing, and at that time, according to his evidence, the train crew was in the act of stopping the train, and he testified "the truck had not gone very far before the train stopped."

In the evidence of these three trainmen, which is in unusual accord as to the speed of the truck, notwithstanding no one of them was in a particularly advantageous position for estimating that speed, as to the time the train had been stopped prior to the collision, and the distance the truck was from the train at the time the latter stopped, there is hopeless conflict. That of the conductor, being that the train had stopped a minute or a minute and a half prior to the collision and that the truck was 500 feet away from the train at the time the latter stopped and was traveling at 50 to 60 miles per hour, does not seem to be reasonable under the disclosed surroundings. That of each trainman concerning the speed of the truck was admittedly based at least in a large part on the sound of the motor. The conductor, who was nearer to the crossing than either of the others, admitted that his estimate of the speed was based entirely on the sound and vibrations of the motor.

Nothing is more uncertain and unreliable than the testimony of witnesses as to the time occupied in such a transaction, or as to such happenings under such conditions. Legere v. New England Furniture Co., N. H., 200 A. 394, and Silvers v. Potter, 48 N.J. Eq. 539, 22 A. 584.

Such evidence may have been treated as doubtful and negligible by the experienced judge who presided at the trial below. Davis v. Chicago, R. I. § P. Ry. Co., 8 Cir., 159 F. 10, at page 13, 16 L.R.A., N.S., 424.

No attempt was made to describe how the speedometer operated. The deputy sheriff stated that he did not know what caused speedometers to set at any particular point. In Jones v. Traver, 275 Ill.App. 181, 192, there being no evidence to show what happened to the speedometer when the car was

wrecked, or what kind of a speedometer it was or how it operated, the court excluded testimony that the speedometer registered 60 miles per hour following the accident.

At time of accident (6 o'clock in the evening of November 25, 1934) the headlights of the truck, as well as those on the train, were lighted. The evidence of the deputy sheriff was that the accident occurred after dark, and that it was a clear cold night, and of the conductor that "it was fairly dark at the time of the accident." A headlight was located on both the front and rear of the locomotive. Plaintiff in his brief states that "the entire train was illuminated by the rear headlight." This was brought about by leading questions on the part of plaintiff's attorney in the following manner:

"Q. It illuminates the ground how far? A. I could not say how far, but I would say the headlights will give us a clearance for a quarter of a mile, possibly a little better than that.

"Q. Be a little more specific, Mr. Terry, if possible. Will it throw a light on top of the bunk? A. On top of the bunk, yes.

"Q. On a train consisting of gondolas, it will throw a light over them, clear over the gondolas? A. Clear over the gondolas."

The probative value of evidence of a witness is lessened where obtained by leading questions which were so propounded that the witness practically merely assents or dissents. 23 C.J. p. 40, Sec. 1785.

In Elliott v. Parr, 100 Colo. 204, 66 P. 2d 819, it is said [page 821]:

"As to the alleged warranty of safety, neither the plaintiff, nor her friend, Mrs. Johnson, volunteered the information that Parr had said the machine was safe, but answered affirmatively to a leading question calling for that testimony. While this was not objected to, it does indicate that this alleged warranty was not clear and unequivocal."

The locomotive was located about a quarter of a mile to the southwest of the intersection, the railroad track and the highway not intersecting at exact right angles, the engine pointing slightly south of a westerly direction, causing the headlights of the locomotive, both front and rear, to shine practically at right angles during all the time that it was approaching this intersection. At a time when the truck driver might have been expected to have reached a point so close to the crossing that the rear headlight would have shone in his general direction, his attention would necessarily be directed to the road directly in front of him and not to a point a quarter of a mile to his left.

The brakeman testified that immediately before the collision he heard a squealing which "sounded like rubber sliding." Plaintiff concedes that the brakes on the truck were applied a very short distance before the crossing was reached. The testimony is undisputed that the truck was turned slightly to the right so that the right front wheel was off the oil surface at time of collision. Notwithstanding this effort to avoid accident on part of defendant's driver, the truck collided with side of one of the beet cars and both driver and passenger were killed.

Plaintiff claims that the defendant's driver "was familiar with that highway and with this railway crossing at Springer." The evidence which is supposed to establish this is that of a filling station operator in Torrington to the effect that he "imagined" Jamison had worked for the freight line at least three months before they put him on the express truck, and that he was "not sure" but thought he had been driving the fast express truck at least two or three weeks before the accident.

Neither is showing nor contention made that the Ford V-8 truck was other than in first class condition. The road oiled and level, straight and dry, country sparsely settled, and crossing at grade, and night clear, from a number of circumstances indicated in the evidence, there was very little traffic. No evidence to the contrary, the plaintiff would presumptively have introduced same had such conditions existed. Under such circumstances a speed of from 50 to 60 miles per hour would not have constituted gross negligence. In fact, the type of service in which this truck was engaged would seem to require a somewhat higher rate of speed than might be expected from a freight truck. Neither is there evidence, circumstantial or otherwise, indicating that Jamison was other than a competent, prudent and careful driver and operated his truck other than in such manner between Cheyenne and the point of the accident nor that his condition immediately prior thereto was other than that of complete sobriety.

While at point of accident the highway was oiled this type of material having been found to provide an excellent road surface so far as traveling qualities are concerned,

it tends to absorb light and renders it somewhat more difficult for one to distinguish objects on or along the road at night, particularly where same are of a dark or dusty color. Plaintiff has himself recognized this fact, there being a verified allegation in his original petition that the trainmen "knew, or in the exercise of ordinary care should have known that on account of the darkness and the condition of said highway, the said highway being an oiled surfaced highway with a tendency to absorb the headlights of motor vehicles, even though properly equipped with headlights, to such an extent as to obscure vision for such a distance as to make it impossible for the operator of a motor truck or motor vehicle to bring the same to a stop in time to avoid a collision with a train or car standing upon said crossing. * * *"

The freight car with which the truck collided, was, as were all other cars in the train, a steel gondola, there being no evidence in the record as to the color of same. If these cars were any other color, or in particular a color which might be more conspicuous, the burden was on the plaintiff to so prove, and not having offered any evidence to that effect the presumption is to the contrary.

Just how familiar the defendant's driver was with the road in general and this railroad crossing in particular is not clear. Plaintiff made no attempt to prove how often Jamison had in any capacity passed over this road during his period of employment.

The collision occurred at a crossing of what was admittedly a branch line of the railroad, one witness referring to it as a "spur" which would indicate it was more in the nature of a siding or switch track. There is no evidence as to how often trains passed over this point, or for that matter, whether any trains ever passed over this crossing on regular schedules. The train involved in this collision was an "extra." The fact that the train was made up entirely of beet cars may lead to the conclusion that this "extra" was engaged in distributing cars for day time loading in connection with the beet harvest.

The trainmen had not had sufficient time either to cut the train at the crossing or to place flares or other warnings at that location.

The contention that the entire train was illuminated by the rear headlight on the locomotive which was standing in the neighborhood of a quarter of a mile to the west is not manifest.

The only evidence concerning this is that of the fireman, who, in response to leading questions, stated that in a train made up of gondolas, the rear headlight would throw a light "clear over the gondolas." The defendant's truck was to the south and it is not clear that such lighting would be so effective.

The west end of the car that was struck was stopped at about the center of the highway, leaving the intervening space between that car and the one immediately to the west slightly to the west of the center of the roadway. An automobile, facing in a southerly direction, had stopped on the north side of the train, and the headlights of that automobile were shining through the space between the two beet cars and directly into the face of the defendant's driver as he approached the crossing.

At a point a few feet from the crossing the brakes on the truck were applied so violently and effectively that the brakeman heard the "squealing" noise of rubber sliding on the pavement at least 600 feet away, the truck being turned to the right so that when the collision occurred, the right front wheel had gone entirely off the pavement.

These are the facts upon which the contention is made that there was substantial evidence of "gross negligence or willful and wanton misconduct" of the defendant's driver. Though there be some evidence of lack of due care, that would constitute only ordinary negligence and not "gross negligence or willful and wanton misconduct." There is no evidence of warning by plaintiff's intestate immediately prior to the accident as the truck approached the crossing. The guest had an opportunity to see the lights of the automobile, which was stopped on the opposite side of the train, shining through the space between the two cars. The effect of these lights on defendant's driver could have been two-fold. Not only could they have indicated to him that the highway between his truck and those lights was clear, and also they must have made it very much more difficult for him to distinguish the dusty colored beet car which was standing across his path. The particular angle at which the tracks crossed the highway would allow those lights to shine into

the eyes of the defendant's driver until the truck had reached a point only a few feet from the train. At that time the driver must have seen the train, and then made a heroic, though fruitless, effort to avoid the collision. He applied with great force his brakes, slid his wheels and turned to the right.

The theory of the plaintiff is that the accident was caused by the "gross negligence or willful and wanton misconduct" of the driver of the truck. The presumption of due care is founded on the instinct of self-preservation. Neither is there presumption that defendant's driver intended to commit suicide nor that he was wholly indifferent to his own safety and welfare and that of his guest. Neither pure speculation and guesswork nor mere conjecture rise to the dignity of evidence. The burden rested upon the plaintiff, which he has failed to meet.

Judgment should be affirmed.