MELBY, Respondent, v. ANDERSON, Appellant.

(266 N. W. 135.)

(File No. 7882. Opinion filed April 2, 1936.)

250

*Danforth & Davenport,* of Sioux Falls, for Appellant.

*McFarland & Paterson,* of Watertown, and *L. A. Melby,* of Webster, for Respondent.

RUDOLPH and CAMPBELL, JJ. This action, brought by the administratrix of the estate of Olaf Melby, deceased, who at the time of his death was a guest passenger in the defendant's car, involves a construction of chapter 147, Laws 1933, the so-called guest statute, which, so far as material here, is as follows: "Provided that no person transferred by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have cause of action for damages against such owner or operator for injury, death or loss, in case of accident, unless such accident shall have been caused by the gross negligence or wilful and wanton misconduct of the owner or operator of such motor vehicle and unless such gross negligence or wilful and wanton misconduct contributed to the injury, death or loss for which the action is brought."

When our Twenty-Third Legislature assembled in 1933 "automobile guest statutes" had previously been passed and published and were available for examination and comparison in seventeen states, as follows: California, Statutes 1931, p. 1693 (amending

statutes 1929, c. 787, p. 1580) Connecticut, Public Acts 1927, ch. 308; Delaware, Laws, vol. 36, ch. 270; Idaho, Laws 1931, ch. 135; Illinois, Laws 1931, p. 779 (Smith-Hurd Ann. St. c. 95½, § 58); Indiana, Acts 1929, p. 679, c. 201; Iowa, Acts 1927, ch. 119 (Iowa Code 1927, § 5026-b 1); Kansas, Laws 1931, ch. 81; Kentucky, Acts 1930, ch. 85; Michigan, Public Acts 1929, p. 44, No. 19; Montana, Laws 1931, ch. 195; Nebraska, Laws 1931, ch. 105; North Dakota, Laws 1931, ch. 184; Oregon, Laws 1929, ch. 401, p. 550 (replacing Laws 1927, ch. 342, p. 448); South Carolina, Acts 1930, p. 1164; Texas, Acts 1931, p. 379, c. 225 (Vernon's Ann. Civ. St. art. 6701b); Vermont, Public Acts 1929, p. 87, No. 78.

The material portion of the Michigan statute reads as follows: "Provided, however, That no person, transported by the owner or operator of a motor vehicle as his guest without payment for such transportation shall have a cause of action for damages against such owner or operator for injury, death or loss, in case of accident, unless such accident shall have been caused by the gross negligence or wilful and wanton misconduct of the owner or operator of such motor vehicle and unless such gross negligence or wilful and wanton misconduct contributed to the injury, death or loss for which the action is brought."

It will be observed that our statute (chapter 147, Laws 1933) follows the Michigan statute exactly save only that the second word "however" is omitted; the sixth word "transported" reads in our statute "transferred," a very palpable clerical error; and the word "a" before the words "cause of action" in the third line of the Michigan statute as quoted above is omitted in our statute. None of the statutes above cited corresponds in language with the Michigan statute.

Upon a consideration of these statutes, it appears clear beyond question, not only that our Legislature adopted the Michigan statute, but also that our Legislature did not adopt any other statute, and we do not face here the dilemma suggested in Pierson v. Minnehaha County (1910) 26 S. D. 462, 128 N. W. 616, 617, Ann. Cas. 1913B, 386, where the court points out that at the time of the South Dakota legislative act "there were a number of other states having a similar statute" and inquires, "How is it possible, under such circumstances, for this court to determine, with absolute cer-

tainty, from what state our Legislature copied or adopted a law?" In the present case an inspection of the existing statutes demonstrates clearly and affirmatively that our Legislature did "copy and adopt" the Michigan law and no other.

Before we thus took over the Michigan statute it had been discussed and construed by the Supreme Court of Michigan in at least eleven different cases during a period extending from January, 1931, to January, 1933, as follows: Naudzius v. Lahr (Jan. 1931) 253 Mich. 216, 234 N. W. 581, 74 A. L. R. 1189, 30 N. C. C. A. 179; Oxenger v. Ward (Jan. 1932) 256 Mich. 499, 240 N. W. 55; Van Blaircum v. Campbell (Jan. 1932) 256 Mich. 527, 239 N. W. 865; Finkler v. Zimmer (April 1932) 258 Mich. 336, 241 N. W. 851; Bobich v. Rogers (April 1932) 258 Mich. 343, 241 N. W. 854; Boyle v. Moseley (April 1932) 258 Mich 347, 241 N. W. 849; Morgan v. Tourangeau (Sept. 1932) 259 Mich. 598, 244 N. W. 173; Willett v. Smith (Sept. 1932) 260 Mich. 101, 244 N. W. 246; Wyma v. Van Anrooy (Oct. 1932) 260 Mich. 295, 244 N. W. 478; Mater v. Becraft (Jan. 1933) 261 Mich. 477, 246 N. W. 191; Grabowski v. Seyler (Jan. 1933) 261 Mich. 473, 246 N. W. 189.

Conceding that the prior Michigan interpretation of the statute is not binding upon us "unless we feel that such construction is sound and based upon reason" (State v. Nelson (1931) 58 S. D. 562, 237 N. W. 766, 768, 76 A. L. R. 1226), it is nevertheless the general presumption that the South Dakota Legislature intended to enact a law with the meaning that the courts of Michigan had previously placed upon the Michigan statute which our Legislature adopted. Woodbine Savings Bank v. Yager (1932) 61 S. D. 1, 245 N. W. 917; State ex rel. Byrne v. Ewert (1916) 36 S. D. 622, 156 N. W. 90; Plowman v. Morden (1914) 33 S. D. 593, 146 N. W. 914; Murphy v. Plankinton Bank (1904) 18 S. D. 317, 100 N. W. 614; Tobin v. McKinney (1900) 14 S. D. 52, 84 N. W. 228, 91 Am. St. Rep. 688; State v. Reddington (1895) 7 S. D. 368, 64 N. W. 170; Kent v. Dakota, etc., Ins. Co (1891) 2 S. D. 300, 50 N. W. 85; White v. C. M. & St. P. Ry. (1889) 5 Dak. 508, 41 N. W. 730.

A fair statement of the net result of these Michigan cases construing this statute prior to our adoption thereof seems to us about as follows: That "gross negligence," as used in the statute, is

really a misnomer, and that the conduct described by those words transcends negligence and is different in kind and amounts to willful, wanton, or reckless misconduct as distinguished from negligence even though spoken of as gross negligence. Its characteristic is willfulness rather than inadvertance. That there is no such thing as "gross negligence" in the sense of great or much negligence, and the term as implied in the statutes does not mean something of a less degree than willful or wanton misconduct. That to create liability under the statute there must be (1) knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another; (2) ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; (3) omission to use such care and diligence to avert the threatened danger when, to the ordinary mind, it must be apparent that the result is likely to prove disastrous to another.

Practically the same result as a matter of construction of analogous statutes has been reached in other jurisdictions which, as is also true in this jurisdiction, do not recognize degrees of negligence and which are unwilling to define the term gross negligence as being merely more or greater negligence than is implied by the word negligence standing alone without the adjective gross. For a good discussion of the matter in this regard, see Stout v. Gallemore (1933) 138 Kan. 385, 26 P. (2d) 573. See, also, Sayre v. Malcom (1934) 139 Kan. 378, 31 P. (2d) 8, and Murrell v. Janders (1935) 141 Kan. 906, 44 P. (2d) 218.

We appreciate that the standard of conduct set up by the Michigan court, as being within the meaning of the statute, is the kind of conduct that we said in Wittstruck v. Lee, 62 S. D. 290, 252 N. W. 874, 92 A. L. R. 1361, could not as a practical matter be properly determined by a jury as distinguished from negligent conduct. In the Wittstruck-Lee Case the question involved was whether contributory negligence was a defense which could be pleaded against this kind of conduct of which we are speaking. A holding contrary to that of the Wittstruck-Lee Case seems to us to tend toward the recognition of the doctrine of comparative negligence in that it in substance (though not in words) encourages the jury to weigh the relative negligence of the plaintiff

and defendant in cases where contributory negligence is pleaded in actions for negligent tort. We are opposed to the doctrine of comparative negligence and do not believe the courts ought to try to submit this particular standard of conduct to the jury in ordinary negligence cases. However, in view of the fact that the Legislature has seen fit to adopt the Michigan statute, we accept it as such, and with it the construction that had theretofore been placed upon the statute by the Michigan court. The statute applies, of course, only to the so-called guest cases, and in this class of cases there will be no temptation of the jury to weigh the relative negligence because the only question involved will be whether or not the conduct of the defendant is such that it comes within the meaning of the statute.

We conclude, therefore, as follows: This statute was taken from the law of Michigan, and will be construed and interpreted in the light of the Michigan decisions relating to it before our Legislature adopted it. Under those decisions, the words "gross negligence" are, for practical purposes, substantially synonymous with the phrase "wilful and wanton misconduct." Willful and wanton misconduct (and gross negligence as it is employed in this statute) means something more than negligence. They describe conduct which transcends negligence and is different in kind and characteristics. They describe conduct which partakes to some appreciable extent, though not entirely, of the nature of a deliberate and intentional wrong. To bring the conduct of the defendant within the prohibition of this statute the jury must find as a fact that defendant intentionally did something in the operation of a motor vehicle which he should not have done or intentionally failed to do something which he should have done under such circumstances that it can be said that he consciously realized that his conduct would in all probability (as distinguished from possibly) produce the precise result which it did produce and would bring harm to the plaintiff.

Respondent contends that in the cases of Endorf v. Johnson, 59 S. D. 549, 241 N. W. 519, and Holdhusen v. Schaible, 60 S. D. 275, 244 N. W. 392, this court recognized that gross negligence constituted a standard of conduct, and that this standard of conduct was something different than willful and wanton conduct. We

did not so intend. In both of these last-cited cases it was argued that this court had by its decision in the case of Carlson v. Johnke, 57 S. D. 544, 234 N. W. 25, 72 A. L. R. 1352, recognized degrees of negligence and approved the doctrine of comparative negligence. It was argued that in the Johnke Case we had recognized gross negligence as a standard of conduct. We attempted to point out that we had not recognized any such standard, but that the facts in the Johnke Case constituted something more than negligence. All that we meant in those cases was that willful or wanton misconduct was a different thing from negligence, no matter what adjective is appended thereto. In the opinion in Endorf v. Johnson, however, we definitely pointed out that the words "gross negligence" have been frequently misused as being equivalent to willful and wanton misconduct, and we specifically cited two Michigan cases discussing that precise point at considerable length; to wit, Gibbard v. Cursan (1923) 225 Mich. 311, 196 N. W. 398, and Union Trust Co. v. Detroit, etc., Ry. Co. (1927) 239 Mich. 97, 214 N. W. 166, 66 A. L. R. 1515. We simply said in those decisions that it was not proper or accurate to use the words "gross negligence" as descriptive of the type of conduct more properly denominated as willful or wanton, but we certainly recognized that the words had often been thus misused, and manifestly there is nothing about those decisions to prevent the Legislature from repeating the same inaccurate and improper use of the words. In the light of all the circumstances, we believe that that is what the Legislature did in the 1933 guest statute.

It is now necessary to review the facts in the case in the light of the construction we have placed upon this statute. The trial court submitted the case to the jury, and the jury returned its verdict in favor of the plaintiff. The defendant has appealed. It is the contention of the defendant that the facts do not justify the verdict of the jury.

In respondent's brief there is set out a statement of facts made by the trial court. After careful consideration of the evidence, we present the statement made by the trial court as the correct statement of the facts, giving to these facts an interpretation most favorable to the plaintiff.

"The Anderson car was driven west for one-half mile on the

section line, which, although gently rolling, was slightly upgrade until it reached the east crest of the ravine. From the high point there was a gentle downward slope for about 60 feet, then a steep decline for around 230 to 250 feet to the bottom. For about 25 feet at the bottom the road is practically level. In the center is a small bridge, the sides of which were built up of plank extending about 2 feet upward. From the bridge the road rose on a rather gentle incline for about 65 to 75 feet, where it curved to the right in the beginning of an S-curve, having a much steeper grade, and reaching the west crest at a point considerably north of the section line.

"The entire strip of road was a gravelled highway. Where straight the graveled and traveled portion was about 16 feet wide, but widened to about 25 feet at the curve. At this point there was a rather wide, grassy shoulder on the south side, and a ditch about 2 feet deep, sloping from the north but with vertical bank on the south.

"On the right or north side of the road there was a wide ditch deep at the bridge but shallow at the curve. To the right or north is a grove so that from the bridge one could see a car approaching from the west for about 150 feet west of the bridge, beyond which point the trees would more or less obscure it. One descending the east slope finds his car pointed directly at the Hoogshagen barn which is directly down the section line, a short distance west of the curve and situated part way up the western slope.

"Except for a slight narrowing at the bridge, there is no curvature in the road from the east crest to a point about 75 feet west of the bridge, where the accident occurred, and where the road commences to curve to the right.

"The road is a graveled, maintained, county highway and is the road usually traveled in going from Summit to Wilmot, Peever and Sisseton. The defendant was well acquainted with the road.

"The defendant, Anderson, is an insurance agent living at Wilmot. The deceased, Melby, was a druggist living in Summit. They had been acquainted for a number of years. Both were members of the Roberts County Relief Committee which met at Wilmot on Saturday, August 12th, 1933.

"The meeting did not adjourn until after the train had left, and Mr. Melby had no car. The Chairman knowing that Melby would not want to stay in Wilmot until Monday, asked Anderson if he would drive Melby home, which Anderson agreed to do. On the trip to Summit, Mr. Anderson collided with the car of Mr. Nancarrow, and three days later Mr. Melby died as the result of injuries sustained in the collision. Mr. Anderson was receiving no pay or compensation from anyone for making the trip, which was made for the accomodation of Mr. Melby and at the request of the Chairman of the Relief Committee.

"Upon this trip, Mr. Anderson wore tinted glasses in addition to his regular spectacles. The brakes of his Model A. Ford were in good working order. The Court will take judicial notice that such a car driven 20 miles per hour covers 30 feet of distance per second and can be brought to a full stop in 21 feet. At 30 miles per hour it covers 44 feet per second and can be brought to a full stop in 47 feet. At 40 miles per hour it travels 59 feet per second and can be brought to a full stop in 82 feet. As he drove westward over the half mile stretch east of the ravine, the sun was directly down the road in front of him, and just above the horizon. At the crest of the hill, Mr. Anderson stated that he received a flash of the sun in his eyes which temporarily blinded him. In fact, he had been driving against the sun in about the same situation for a half mile before he reached the crest. Although blinded, it appears that he did not remain so except during the 50 or 60 feet next west of the eastern crest. At that point the road descended steeply and the visor of the car cut off the sun and sky line, and the sun therefore did not shine in Mr. Anderson's eyes while descending. It is not entirely clear how long Mr. Anderson's vision was affected by the 'flash,' which he received at the crest. He testified that he was not blinded but could see as he descended. However, as he reached the level or comparative level ground at the bottom, the sun again shown fully in his eyes. This necessarily occurred at or a few feet east of the bridge. Mr. Anderson testified that he could not see the bridge nor the curve in the road which was approximately 100 feet to the west of him, nor could he see the Nancarrow car while it was approaching him or while it was stopped at the extreme edge of the road near the

curve. Mr. Anderson proceeded through the bridge without seeing it, driving down the center of the road and angling a little bit to the left or south, unable to see the road, the ditch, the curve, the approaching car or the Hoogshagen barn directly ahead of him. If the Nancarrow car had not been where it was, Mr. Anderson would have run into the ditch at that point.

"Nancarrow, approaching from the west, had descended the S-curve. He saw Mr. Anderson's car cross the bridge and proceed westward along the wrong or south side of the road. Mr. Nancarrow was driving slowly, and at the last curve to the east, at a point where the road was wider that usual, seeing the Anderson car approaching on the wrong side of the road, Nancarrow pulled off to the right shoulder and brought his car to a complete stop, or practically so, with his left wheels barely on the gravel and his right wheels in the grass, leaving the entire width of the road for Mr. Anderson to drive upon, a space wide enough for three cars to pass according to Mr. Nancarrow. Mr. Anderson drove into the Nancarrow car, the left part of the Anderson car striking the Nancarrow car well over to its right side. Mr. Anderson's left front wheel was then entering the ditch at his left side of the road. The collision occurred about 75 feet west of the west edge of the bridge and about 100 feet west of the point where the Anderson car had reached practically level ground and where the sun had for the second time blinded Mr. Anderson.

"Considering the factor of speed. Mr. Anderson's statements in regard to his speed vary. His written proof of loss reported to the insurance company does not coincide with his testimony. It appears that during the one-half mile that he drove west before reaching the crest, he was driving at about 35 miles per hour. There is no one to dispute his testimony, and Mr. Anderson is the only witness as to that. He further testified that as he descended the hill he took his foot off from the accelerator and applied his brakes slightly but it appears that he did not appreciably diminish his speed but applied the brakes in such a manner as to prevent his speed from becoming accelerated. It appears that he did not slacken speed appreciably from the point at the bottom of the hill where he was blinded for the second time, but drove westward, so blinded that he could see neither the bridge,

the curve, the Nancarrow car nor the Hoogshagen barn. Mr. Nancarrow estimated Mr. Anderson's speed at the point of impact at 25 or 30 miles an hour. Here certain physical facts are important. The Anderson car was almost entirely demolished. Mr. Nancarrow had heavy tools on the floor of the back seat of his car and in a trunk on the rear. The cover to the trunk was thrown open, the tools thrown out with such violence that a one inch iron constituting the handle to a threading die was broken. The front seat of the Nancarrow car was torn lose from its bolted foundation. As stated, the Anderson car was almost completely demolished. Mr. Melby was thrown forward and received injuries from which he died.

"In descending the S-curve, the Nancarrow car drove at a speed of not to exceed 20 miles an hour which slackened down to nothing by the time it reached the point of the accident. The exact number of feet between the bridge and the point of the accident is not definitely known, but Mr. Nancarrow testified that he was still going down grade and had not quite made the turn but was about half way around when he first saw the Anderson car and it appears that he had reached and stopped at the point where the curve straightened out to the east when the accident occurred. This would be in the neighborhood of 75 feet west of the west edge of the bridge and in excess of a hundred feet west of the point at which the road flattens out and where Mr. Anderson must have been blinded for the second time. It would seem that there was nothing to obstruct his vision which would have prevented Mr. Anderson from seeing the Nancarrow car before he was blinded for the second time, and from all the testimony and the physical facts I believe a juror would be warranted in believing that Mr. Anderson traveled about 150 feet while the Nancarrow car was in plain sight, without seeing it, and that only during the last hundred feet or thereabouts was Mr. Anderson blinded."

Respondent contends that the jury could reasonably find from the evidence that the defendant, Anderson, was blinded by the sun from the time he reached the top of the hill until the time the accident occurred, which would be an approximate distance of 350 feet or more. We have carefully read the evidence and we believe that the most that can be said therefrom is, as found by the trial

court, that Anderson was blinded by the sun for approximately 100 feet just before the collision occurred. The trial court, after stating the facts, suggests that there are contradictions in Mr. Anderson's testimony which would justify the jury in disregarding some of this testimony. These contradictions, as pointed out by the trial court, are as follows:.

"He testified that he would not and did not see the sun while he was on the bridge. And also that it was on the bridge where he was blinded, and also that it might have been some distance either way from the bridge, and also that he neither saw the bridge or was conscious that he passed over it.

"He said that he got a flash of the sun at the top of the hill but was not blinded. Again he said that he could not see until he started to descend. At the bottom of the hill he was in no different situation than he had been for practically a half mile east of the brow.

"He said that he did not see the Nancarrow car until he hit it. And also that he did not see the bridge because possibly he was watching the car ahead, which was Nancarrow's.

"He said that he applied both the footbrake and emergency when blinded at the bottom of the hill but also testified that he had never used the emergency; also that when blinded at the bridge he expected to be able to see at any instant. Although the wrecker crew found the emergency brake set when they arrived, the frame was buckled and the car well scrambled, and the jury may well have found that Anderson neither applied the footbrake nor the emergency, in view of Nancarrow's testimony. Anderson's testimony, the evidence of speed, distance travelled, time elapsed and the physical destruction wrought by the impact. * * *''

Even conceding all of these contradictions and their materialty, yet, we do not believe a case was made out for the jury under the construction we have placed upon this statute. Mr. Anderson had been driving against the sun over a half mile stretch east of the ravine without accident although at times momentarily blinded. Going at the rate of thirty or thirty-five miles per hour for the 100 feet intervening between the time he became blinded and the point of the accident, only two or three seconds would elapse in time. There is nothing in the above facts which, in our opinion indicates

a realization on the part of Anderson that his conduct at the time in question would in all probability bring injury to his guest passenger. While Anderson was undoubtedly negligent, we are, nevertheless, convinced that his acts were not such as to come within the meaning of the statute.

The judgment appealed from is reversed, and the trial court is directed to enter judgment for the defendant.

All the Judges concur.