WENTZEL, Respondent v. HUEBNER, Appellant

(104 N.W.2d 695)

(File No. 9814. Opinion filed September 2, 1960)

. Affirmed.

**Hanley, Costello & Porter,** Rapid City, for Defendant and Appellant.

**Bottum & Beal,** Rapid City, for Plaintiff and Respondent.

SMITH, J.   The paramount contention of the defendant in this action, brought under SDC 44.0362, commonly referred to as the guest statute, is that the evidence, considered most favorably from plaintiff's viewpoint, fails to establish "willful and wanton misconduct" on the part of defendant. The case was submitted to the jury and a substantial verdict for plaintiff was returned. The stated contention was raised below by a motion for a directed verdict made at the close of plaintiff's evidence, and renewed at the close of the evidence, and by motions for a judgment n. o. v. and for a new trial.

The father of defendant is an expert mechanic. He had owned a racing car in which he had installed a 1952 DeSoto V-8 motor which he had modified in many respects to enhance the speed of the vehicle. In the spring of 1957 he withdrew that car from racing and in the summer of that year installed its motor with its modifications in a 1950

Plymouth Tudor sedan. The father testified that later in the summer or very early fall he removed the modifying parts and restored the motor to stock condition.

During the evening of November 14, 1958 defendant, home on furlough from the Marines, was driving this sedan and had as his guests therein five Rapid City youths, including plaintiff, Vernon Wentzel. Eventually the group purchased a pint and a half of whiskey and two quarts of beer and repaired to the quarters of a seventh young man. Plaintiff and another of the group drank the two bottles of beer. The others consumed the whiskey. Plaintiff testified that one of the young men drank a glass full of whiskey and that the defendant had more to drink than anybody. Defendant testified that he had one mixed drink and two drinks from a bottle. The six eventually returned to the automobile and continued to drive about the city. At one point they all got out of the car, and one young man, who had become ill, relieved himself. Thereafter they continued cruising about. The record evidences no excessive speed or unusual driving while going about the city. Plaintiff said defendant was not intoxicated and the only changes he noticed in defendant after their drinking was in his voice. When asked if he had not admitted on a previous occasion that defendant drove a little faster after the liquor was consumed his answer was, "I said maybe; I'm not sure."

Finally defendant drove north out of the city on what is known as Deadwood Avenue. About two miles north of the city he came to a stretch of road, presently to be described in some detail, which included several curves. It was at this point that defendant put his car in second gear and began the sharp acceleration which ended in disaster. Plaintiff, who was seated at the right in the rear seat, became alarmed and in a loud tone, almost a shout, asked him to slow down. Another youth in the back told plaintiff to shut up, that defendant was a good driver. Without any character of response to plaintiff's demand, defendant continued to accelerate until a speed was attained estimated by plain-

tiff as between 70 and 90 miles per hour. After traversing three curves the car came to a somewhat sharper fourth curve; then it hurtled head-on through the air from the banked grade and struck a power pole 9 feet up from its base and 35 feet from the point of the car's departure from the grade. The vehicle made no marks in the snow between the grade and the pole. The power pole was broken in two places. The break at the level of the ground was described as a pressure break. The upper break at the 9-foot level was of like character but bore evidence of shearing. No other mark indicating a point of impact appears on the pole. A creasing crush angled across the front top of the car. The record is silent as to any skidding of the automobile during its course. Two of the young men were killed and plaintiff was severely injured; he was pinned under a hanging door when the car came to rest. Testimony with reference to events after the acceleration had commenced came from plaintiff. The defendant and the other two survivors testified that they had no memory as to what happened from the moment defendant increased his speed. Defendant did talk to an officer at the scene of the accident but appeared dazed. He also came to plaintiff where he was pinned under the car and said "Remember Price was driving." Price was one of the young men who was killed.

A professor of science from the South Dakota School of Mines and Technology was called by plaintiff as an expert witness .He expressed the opinion that the free flight of the car indicated a minimum speed of a least 70 miles per hour at the moment of its departure from the grade. He refused to express an opinion of the maximum speed at that moment, but said there was evidence of a much higher rate of speed.

On cross-examination this expert testified that, assuming gear ratios in the transmission and differential of the car as stated by defendant and his father, the car would be capable of a speed of 53 miles per hour in second gear. However, he reaffirmed his opinion as stated on direct that the car had to be traveling at a minimum speed of 70 miles per

hour at the moment it left the grade in order "to accomplish what it did accomplish."

Another witness for plaintiff told of a ride he had been given in the car by defendant at a time after the time fixed by the father when he had removed the racing modifications therefrom, and said that during that ride while traveling up a described road in second gear the speedometer registered 95 miles per hour.

This stretch of curved highway had been posted by authorities for a speed limit of 35 miles per hour. An officer had prepared himself by measuring distances, and described it in detail. In length, from the point of commencement of the acceleration, it measures a mile and a tenth. At two-tenths of a mile a 120-degree curve commences; at three-tenths of a mile from the end of that curve there is a curve of 150 degrees; four-tenths of a mile from that curve another 150-degree curve begins; and finally after three-tenths of a mile there is the fourth sharp curve of 100 to 120 degrees. A photograph offered as an exhibit reveals the banking of this final curve. Under normal conditions the surface of the highway is smooth blacktop. On the night in question there was snow on the ground; it was drizzling and there was some icing on the highway.

Defendant admitted he had driven along this winding highway at least ten times, and that his driving included experience in driving both directions. He said he had not been on it for a year and did not remember it in detail.

The argument of defendant's counsel that the evidence we have outlined fails to establish the wilful and wanton misconduct made essential by SDC 44.0362 to a recovery of damages by such a guest as plaintiff against the operator of the motor vehicle in question is predicated on passages from our decisions.

In the leading case of Melby v. Anderson, 64 S.D. 249, 266 N.W. 135, 137, this court concluded our statute had been taken from Michigan and that it would follow the interpretation of its language as theretofore expressed by the Michi-

gan court. Its understanding of that interpretation was declared in two passages. First, it was written:

> "That to create liability under the statute there must be (1) knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another; (2) ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; (3) omission to use such care and diligence to avert the threatened danger when, to the ordinary mind, it must be apparent that the result is likely to prove disastrous to another."

It was also written:

> "Under those decisions, the words 'gross negligence' are, for practical purposes, substantially synonymous with the phrase 'wilful and wanton misconduct. 'Willful and wanton misconduct (and gross negligence as it is employed in this statute) means something more than negligence. They describe conduct which transcends negligence and is different in kind and characteristics. They describe conduct which partakes to some appreciable extent, though not entirely, of the nature of a deliberate and intentional wrong. To bring the conduct of the defendant within the prohibition of this statute the jury must find as a fact that defendant intentionally did something in the operation of a motor vehicle which he should not have done or intentionally failed to do something which he should have done under such circumstances that it can be said that he consciously realized that his conduct would in all probability (as distinguished from possibly) produce the precise result which it did produce and would bring harm to the plaintiff."

In Granflaten v. Rohde, 66 S.D. 335, 283 N.W. 153, 156, it was written: "* * * it (wilful and wanton misconduct) in-

volves the affirmative elements of consciousness of one's conduct and not merely the negative element of negligence." This case also makes reference to "an affirmatively reckless state of mind."

In Espeland v. Green, 74 S.D. 484, 54 N.W.2d 465, 467, however, in declaring that Melby v. Anderson, supra, authorizes the application of an external standard in a determination of whether a defendant consciously realized that his conduct would in all probability produce harm to plaintiff, it was written, "Under it (the external standard) the driver's mental attitude is established not by what he said nor even by what he may actually have thought, but rather by the attitude that an ordinarily prudent person would have had under all the attending circumstances."

The foregoing holding was emphasized in the subsequent cases of Allen v. McLain, 74 S.D. 646, 58 N.W.2d 232; Chernotik v. Schrank, 76 S.D. 374, 79 N.W.2d 4; and Berlin v. Berens, 76 S.D. 429, 80 N.W.2d 79. Of interest is the following which we quote from Stevens v. Stevens, 355 Mich. 363, 94 N.W.2d 858, at page 863, a case wherein the same contentions were made as are presented here,

"In testing for the statutory standard of 'gross negligence or wilful and wanton misconduct,' as for the common-law standard of ordinary negligence, we normally examine the external conduct of the defendant, not his state of mind. * * * Should the driver of a school bus injure his charges through passing a car at high speed on the wrong side of a blind curve we would not be too much concerned with his professed sensitivity for the welfare of his helpless charges. His conduct is judged by what he did under the circumstances confronting him at the time. Holmes summarized (Collected Legal Papers, 117) in these words:

"The standard applied is external, and the words malice, intent, and negligence, as used in this connection, refer to an external standard. If the

manifest probability of harm is very great, and the harm follows we say that it is done maliciously or intentionally; if not so great, but still considerable, we say that the harm is done negligently; if there is no apparent danger, we call it mischance.' "

Defendant accepts these authoritative declarations of this court as sound, but pointing to the three cases in which we have held evidence sufficient to support a finding of wilful and wanton misconduct, viz., Martins v. Kueter, 65 S.D. 384, 274 N.W. 497; Stoll v. Wagaman, 73 S.D. 186, 40 N.W.2d 393, and Allen v. McLain, supra, in each of which there was proof of a persistent course of misconduct after ample warning, or after it became apparent that a continuance of such misconduct would result in injury to the defendant's guests, he urges that the facts here show no more than that "Defendant apparently misjudged his speed for the condition of the roadway and the curve on which the crash occurred, but this error of judgment was at the most mere negligence." And again it is said "* * * 'plaintiff's case lacks the vital element * * * described and termed 'an affirmatively reckless state of mind' on defendant's part." At bar we were told that the showing was of nothing more than excessive speed. We do not share these interpretations of the record.

■ The inferences of fact which, in our opinion, the triers of the fact could reasonably draw from the evidence are as follows. The segment of winding highway involved had come under consideration by the authorities and based on its normal characteristics had been judged to require a speed limit of 35 miles per hour in the interests of public safety. That its inherent overall dangerous characteristics were known to defendant is indicated by the fact that Rapid City was his home, and he admitted traveling thereon ten times, and that such travel included driving in both directions. At the time of the accident it was dark. The presence of snow on the ground and of drizzle and icing was apparent to him and thus he must have been aware of the extent by which the normal elements of hazard had been magnified,

and of the obvious fact that the roadway was then a tremendously dangerous speedway. He had no destination in mind and no social reasons for excessive speed existed. He had been driving with ordinary care up to that point but elected to accelerate when he came to this winding road. His probable purpose in so doing was to give himself and his companions a thrill. Notwithstanding the protest of plaintiff at about the halfway mark he continued to accelerate until he finally had obtained a speed which launched him in free flight for a considerable distance after he went off the grade. True he applied his brakes in the final seconds of his contact with the grade, but that merely reduced his speed in a slight degree. He intentionally employed excessive speed which was rendered highly dangerous by circumstances known to him, and thus exposed his guests to the probability of harm.

All of the elements declared by Melby v. Anderson, supra, to be essential to an ultimate conclusion of wilful and wanton misconduct find ample support in these permissible inferences of fact. They warrant the conclusions that the likely disastrous result from the described intentional conduct would have been apparent to the ordinary mind; and that the defendant intentionally did something in the operation of a motor vehicle which he should not have done under such circumstances that it can be said he consciously realized that his conduct would in all probability bring harm to his guests. Hence, it follows that the court did not err in denying defendant's motions.

The cases urged upon us as leading to a different result have received painstaking attention, but as each of these matters turns upon whether its own peculiar facts satisfy the tests declared in Melby v. Anderson, supra, we see nothing to be gained by extending this opinion to point up factual differences.

In point of importance the next matter requiring consideration involves separate rulings of the trial court dealing with expert testimony. For a background of universally accepted principles, we quote with approval from § 13, McCormick on Evidence as follows:

"An observer is qualified to testify because he has first-hand knowledge which the jury does not have of the situation or transaction at issue. The expert has something different to contribute. This is a power to draw inferences from the facts which a jury would not be competent to draw. To warrant the use of expert testimony, then, two elements are required. First, the subject of the inference must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman, and second, the witness must have such skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth. The knowledge may in some fields be derived from reading alone, in some from practice alone, or as is more commonly the case, from both. While the court may rule that a certain subject of inquiry requires that a member of a given profession, as a doctor, an engineer or a chemist, to be called, usually a specialist in a particular branch within the profession will not be required. The practice, however, in respect to experts' qualifications has not for the most part crystallized in specific rules, but is recognized as a matter for the trial judge's discretion reviewable only for abuse."

As indicated supra, the plaintiff called a scientist from the South Dakota School of Mines and Technology. Included in his testimony, received over strenuous objections by defendant, were opinions as to (1) the point of impact of the vehicle with the power pole, and (2) the velocity of the vehicle at its point of departure from the roadway. The defendant complains (1) that the witness was not qualified as an expert in the involved particular field of science, and (2) the subject matter is within the scope of common experience and knowledge, and hence expert opinion was not admissible.

Additional facts need to be stated. The power pole had been mounted on a stub to provide essential clearance for

wire which crossed the grade. The stub, which had been sunk six feet into the ground, extended about eight feet above ground. The pole base was fastened to the stub by three heavy steel bands. The assemblage placed the stub directly between the power pole proper and the oncoming car. The impact broke the stub at ground level; this was a splintering pressure break. It also broke the pole proper at a point about nine feet above ground; this break while a pressure break included "considerable shearing." The only mark on the stub which, as we have stated, shielded the pole from the oncoming car, was the break at the ground level. The only mark on the power pole was described break at the nine-foot level. The pole was 35 feet from the point where the car left the grade. A horizontal line from that point on the grade would have bisected the pole at the 7½-foot level above ground. The upper front of the body of the car was crushed down and in towards the front seat, and a depression therein angles from one front corner slightly back of the other front corner.

After the collision the car settled into the snow on all four wheels facing toward the point it had left the grade. It made no other marks in the snow.

Long after the event this witness viewed the broken pieces of the pole and stub, and the body of the car. He estimated the weight of the car with its six occupants to be 3,750 pounds. He stated, however, that the assumption of greater weight of 1000 pounds would not have altered his conclusions.

■■ The contention that this scientist lacked qualification to speak as an expert in the field involved is without merit. As indicated supra, the ruling of a trial court as to the qualification of an expert witness will only be disturbed in case of a clear abuse of discretion. State ex rel. Helgerson v. Riiff, 73 S.D. 467, 44 N.W.2d 126; Borneman v. Chicago, St. P. M. & O. Ry. Co., 19 S.D. 459, 104 N.W. 208. Instead of showing a lack of qualification, the most the facts, if set forth, would evidence is that perhaps there are specialists who are more highly qualified than this highly qualified witness.

■ If it be assumed that the common experience in life of the jurors was sufficient to adequately equip them to pass on the facts we have outlined and determined the point of impact of the car with the pole without the aid of an expert, we think, in the state of this record, it cannot be said that defendant was prejudiced by listening to an expression of the opinion of this witness that such contact was at the point where the pole was broken, nine feet above the ground. Our study of the evidence has convinced us that the opinion but stated what appears as an undisputed fact. The upper part of this automobile struck that pole with sufficient force to break it in two places. It was impossible for the upper crushed portion of the car to contact the pole at ground level. Hence, to say that the upper partially sheared break of the pole does not represent the point of contact is to assert that the car could strike the pole such a blow and leave no mark on the stub or the pole. Reason will not support such a conclusion. We are persuaded that defendant did not suffer prejudice by the statement of this established fact as the expert's opinion.

■ The additional opinion expressed by this expert dealt with the minimum speed indicated by the free flight of this car from the grade to the power pole. The opinion was based upon a computation made possible by a special knowledge of fixed natural laws. We are told that his opinion should not have been received because, drawing on their common experience, the jurors were able to form a conclusion as to the indicated speed from the detailed testimony and exhibits before them. Without doubt the flight of 35 feet of this car, and the indicated potential for more extended flight had it not collided with the power pole, would be indicative of excessive speed to the lay mind. Because such a mind is capable of approximations has not been generally received as a reason for excluding expert opinions when more exact estimates may prove helpful to the trier of the fact. At an early day it was aptly said,

> "The true test of the admissibility of such testimony is not whether the subject matter is common

or uncommon, or whether many persons or few have some knowledge of the matter, but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the Court or jury in determining the questions at issue."

Taylor v. Town of Monroe, 43 Conn. 36, 44.

In their consideration of the conduct of this defendant, in the light of all of the attending circumstances, this jury needed to arrive at a conclusion as to the excessiveness of the speed of the vehicle in assessing the degree of risks to which he intentionally exposed his guests. Because the computation made by this scientist, which the jury was incapable of making, would be helpful, if accepted by them as accurate, we deem the objection of defendant to the reception of his opinion as manifestly without merit.

Expert testimony offered by defendant was rejected by the trial court. The offer first made was of the testimony of a deputy sheriff. As the offer appearing in the record fails to reveal the substance of the opinion this witness would have expressed if he had been allowed to testify and hence we are unable to judge whether the ruling prejudiced defendant, we do not further consider the matter. The second offer was of an opinion by a member of the State Motor Patrol whose experiential qualifications included three years police duty and two and one-half years in the patrol during which he had investigated "quite a number" of accidents. It was also shown: that (1) he was familiar with this winding road; (2) he returned to the city by that route after the event; and (3) in coming to the location when notified of the accident he traveled a different route and lost control of his car attempting to drive at 40 miles per hour. The offer reads "that based on his personal observations and the evidence, in his opinion the defendant's car would have gone off the road if it had been driven in the manner described by plaintiff and under the conditions observed by the witness at the accident scene and in the immediate

vicinity thereof some 25 to 30 minutes after the accident; that the defendant could not have attained such speed of 70 to 90 miles an hour in second gear under such conditions and in such manner considering all the factors in the evidence and the witness' observations, and that again in this witness' opinion the defendant could not have driven over Deadwood road under such conditions and attained a speed of 70 miles per hour or as claimed."

In considering the challenged ruling of the court, we review some evidence. According to plaintiff's testimony defendant shifted to second gear when he came to this stretch of curving road and began his acceleration. It was about the half-way mark that plaintiff became alarmed and shouted for a slow down. By that time the first two curves had been traversed. Instead of heeding plaintiff's demand, defendant continued to accelerate. Thereafter he traversed the third curve which is described as one of 150 degrees. Then followed three-tenths of a mile of continuing acceleration until he reached the final sharp curve. He did not negotiate that curve; at its entrance he drove straight off the grade. The only estimate of speed by plaintiff was that attained as he left the grade, and that was but an estimate. The physical characteristics of the road appear in great detail, and it was shown that its surface which was very smooth ordinarily was wet and icy.

The objection, which the court sustained, to this offer of proof asserted that the subject matter is not beyond the range of common experience, and questioned the qualifications of this witness.

The common experience of this motor age teaches that to employ this slippery winding road as a speedway, as described by plaintiff, involved a constant promise of the stark probability of disaster by going afield at almost any point along its course, plus enhanced danger at particular points. It is also a matter of common knowledge that such factors as the nerve and skill of the driver, the hang of the particular car to the road, its mechanical fitness, and response to the

touch of the driver and many other variables bear upon the degree of danger lurking in the attempt.

These lessons of common experience must have been in the mind of the trial court as it viewed the revealed experience of this witness in search of that which would equip him with knowledge "beyond the ken of the average layman" from which to judge whether it would have been possible for this defendant, driving the described motor in the manner testified to by plaintiff, to negotiate that highway to the point where unquestionably his luck ran out. Without questioning that the described experience of this patrolman qualified him as an expert in certain fields, we are of the opinion that the trial court could reasonably doubt whether his evidenced experience could offer helpful assistance to the jury in determining the plausibility of plaintiff's testimony. As pointed out supra, evidence of the qualifications of a proffered expert is addressed to the sound discretion of the trial court. Helgerson v. Riiff, supra. The trial court has ruled upon the qualifications of this patrolman. Our study has revealed no fact warranting an interference with that ruling.

Our guest statute, SDC 44.0362, quoted in part supra, contains an additional clause reading as follows: "* * *; and no person so transported shall have such cause of action if he has willfully or by want of ordinary care brought the injury upon himself." Defense of contributory negligence and assumption of risk were pleaded by defendant. Motions for a directed verdict and exceptions to the refusal of instructions and to instructions given deal with these matters.

■ Although plaintiff's complaint contained an allegation that defendant drove while intoxicated and he testified to the quantity of liquor consumed by defendant as recited supra, he testified he did not think defendant was intoxicated. He said the only change he noticed was in his voice. He admitted that at a former time he had said in substance perhaps defendant drove a little faster after drinking. He also admitted that two other of the young men evidenced intoxication by their conduct. When asked why he did not remain out of the car after he alighted at the place where one of

the boys was ill he answered he had no reason for so doing; that he had then noticed no conduct or driving of defendant indicating that he should refuse to return to the car. He also indicated that defendant's driving was not open to question until he accelerated when he reached the above described winding road.

The defendant took the stand. He testified he had one mixed drink, and two drinks from a bottle. His counsel did not see fit to inquire whether he felt the effects of those drinks. It is also noteworthy that after the accident there appeared on the scene a city policeman, a deputy sheriff, and a patrolman, in that order. Defendant was in their presence. The deputy sheriff and the patrolman were called to testify by both parties but there was no interrogation about intoxication. The police officer was not called.

Manifestly such a record would not support a ruling as a matter of law that, if, in fact, defendant was intoxicated, plaintiff had knowledge of his condition. The motions to direct were soundly ruled.

Based on a somewhat similar record we said,

"* * * It is the knowledge of the passenger that intoxication exists that places him in the category of one who is deemed to take his chances of an accident and resulting injury. We cannot say as a matter of law that plaintiff knew, or should have known, that appellant was under the influence of intoxicating liquor and was contributorily negligent in continuing to ride with him. * * *"

Peters v. Hoisington, 72 S.D. 542, at page 548, 37 N.W.2d 410, 413. And cf. Annotation 15 A.L.R.2d 1165, at page 1180, § 9.

It so clearly appears that the substance of defendant's requests appears in the court's instructions dealing with defenses of contributory negligence and assumption of risk, and, read as a whole, that the court's instructions fairly sub-

mitted those issues to the jury, we think we should do no more than to indicate our complete agreement with the rulings of the trial court.

Other matters argued have received our careful attention but are not deemed to merit discussion.

The judgment and orders of the trial court are affirmed.

All the Judges concur.