BREWER, Respondent v. MATTERN, Appellant

(182 N.W.2d 327)

(File No. 10707.  Opinion filed December 29, 1970)

Rehearing denied February 1, 1971

**Miller, Kaye & Hanson, and Shandorf & Bleeker,** Mitchell, for plaintiff and respondent.

**Morgan & Fuller,** Mitchell, **Brady, Kabeiseman & Light,** Yankton, for defendant and appellant.

JONES, Circuit Judge.

This is another guest statute case. From a verdict and judgment for the plaintiff, and order denying defendant's motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial, the defendant appeals.

Defendant's first assignment of error is based on his contention that the evidence is insufficient to establish wilful and wanton misconduct on the part of the defendant.

The one-car accident occurred shortly before midnight on April 1, 1967 on a graveled township road between Mitchell and Loomis in Davison County that was being used as a detour. In the car were defendant, the driver, who was 19, the plaintiff and a friend, James Roberts, both age 18. All three were students at the University of South Dakota and members of the same social fraternity, and were at their respective homes for a spring vacation.

The defendant and James Roberts, both from Yankton, had left Yankton about 7:30 p. m. to attend a dance in Tyndall. Before leaving Yankton they purchased a six-pack of beer. After spending some time in Tyndall and buying another six-pack of beer, they decided to go to Mitchell to visit the plaintiff, who was at his parents' home in Loomis, about nine miles northwest of Mitchell. They arrived in Mitchell about 11 p.m., and called the plaintiff at his home. By this time defendant and Roberts had each consumed four cans of beer. They drove north from Mitchell and then west to Loomis on an oiled highway.

The night was dark, misty, rainy and cold. The plaintiff and his father had returned home about 11 p. m. from sweeping ice off the top of the wings of their Piper Cub airplane. The defendant had been using his windshield wipers most of the evening. The weather just after the accident was described as raining, snowing and sleeting.

The defendant and Roberts picked up the plaintiff at his home. Leaving Loomis the defendant was driving, Roberts

was sitting in the middle and the plaintiff was sitting on the right side of the front seat. They decided to take a different, shorter route back to Mitchell. They proceeded south from Loomis on an oiled road for approximately a mile and one-half until they came to a barricade across the road and a detour sign directing them east on a graveled road. A mile east of the first barricade was another detour sign directing traffic south. This road was also graveled and it was described as "sloshy". The bridge which was the scene of the accident was about three-quarters of a mile south of this intersection. After they turned south, the defendant was driving between 50 and 60 miles per hour.

At this point, the plaintiff testified as follows:

"Q   What, if anything, did you say to Richard then and there?

A   We turned and started south; just as he turned south, I said, 'There is a hill coming up and a series of curves, and a bridge that sits at a real bad angle, and that we would have to slow down.'

Q   What did he say?

A   He didn't respond at all. He didn't say anything.

Q   Did he slow up his car?

A   No."

Proceeding south they came to a curve sign indicating a right turn. A red flag was attached to the sign. This was about 1,200 feet from the bridge. The plaintiff testified to another warning being given the defendant at about this point, as follows:

"A   Well, as we proceeded down the road, heading south, perhaps a quarter or half mile away from the bridge, I said, 'Rich, you will have to slow down.' "

Since the defendant did not slow down, this warning was not heeded.

About 800 feet from the bridge was a "Narrow Bridge" sign with a red flag attached to it. About 600 feet from the bridge was a sign stating a speed limit of 25 miles per hour, again with a red flag attached. This was at approximately the beginning of the right curve. About 150 feet from the bridge, the road turned abruptly to the left. This turn was not marked. As the defendant went into this turn, at a speed which the plaintiff estimated at 50 to 60 miles per hour, he lost control of the car and slid sideways about 150 feet into the northwest corner of the bridge.

An examination of the photographs of the accident scene indicates that the locale of the accident could be generally described as an "S" curve with a bridge sitting in the middle of the "S".

The South Dakota guest statute states:

"SDCL 32-34-1. **Guest statute—Willful and wanton misconduct required.**—No person transported by the owner or operator of a motor vehicle as his guest without compensation for such transportation shall have cause of action for damages against such owner or operator for injury, death, or loss, in case of accident, unless such accident shall have been caused by the willful and wanton misconduct of the owner or operator of such motor vehicle, and unless such willful and wanton misconduct contributed to the injury, death, or loss for which the action is brought."

The first case construing this statute, Melby v. Anderson, 64 S.D. 249, 266 N.W. 135, laid down the general principles of law which have been consistently applied to all guest statute cases since 1936:

"That to create liability under the statute there must be (1) knowledge of a situation requiring the exercise of ordinary care and diligence to avert injury to another; (2) ability to avoid the resulting harm by ordinary care and diligence in the use of the means at hand; (3) omission to use such care and diligence

to avert the threatened danger when, to the ordinary mind, it must be apparent that the result is likely to prove disastrous to another."

See also Coon v. Williams, 4 Mich.App. 325, 144 N.W.2d 821.

The meaning of this law is well established by our decisions but difficulty is often encountered in its application. Cluts v. Peterson, 79 S.D. 462, 113 N.W.2d 273. Proof of wilful and wanton misconduct depends upon the facts in each particular case. Elfert v. Witt, 73 S.D. 4, 38 N.W.2d 445. As stated in Allen v. McLain, 74 S.D. 646, 58 N.W.2d 232,

"Of course no two fact situations are identical, and the cases are not too helpful except for giving an over-all picture of the application of the rule."

See also Tien v. Barkel, 351 Mich. 276, 88 N.W.2d 552; Anderson v. Lippes, 18 Mich.App. 281, 170 N.W.2d 908.

Counsel for the defendant strenuously argues that the defendant in this case operated his car this evening without incident or accident until he skidded on the last curve, that he merely failed to negotiate an unmarked curve on an unfamiliar road, and that while he might be negligent, he lacked the affirmatively reckless state of mind referred to in Granflaten v. Rohde, 66 S.D. 335, 283 N.W. 153. After the accident, the defendant stated that he had driven a gas truck for his father on gravel roads and that he could take the curves on those roads faster than most people could.

■ In determining whether the evidence in a guest statute case is sufficient to sustain the verdict of the jury on the issue of wilful and wanton misconduct, the question for this court always is, is the evidence such that a jury might find that to the ordinary mind it must have been apparent that the described conduct would in all probability (as distinguished from possibility) produce the precise result which it did produce and would bring harm to the plaintiff. Allen v. McLain, supra.

■ In determining whether the defendant's conduct in a guest statute case constitutes wilful and wanton misconduct, great stress has been placed on the actual frame of

mind of the defendant. 8 Am.Jur. 2d, Automobiles and Highway Traffic, § 488, p. 56. This stress is proper in those cases in which the evidence establishes clearly the reckless state of mind of a defendant, as in Stoll v. Wagaman, 73 S.D. 186, 40 N.W.2d 393. But this stress can be misleading if it results in considering only the actual state of mind of the specific driver to the exclusion of a consideration of his wilful conduct under the attending circumstances. Minick v. Englert, 84 S.D. 73, 167 N.W.2d 551. The driver who actually thinks that he can safely give his passengers a "thrill ride", or who actually thinks that he can engage in "drag racing" without endangering his guests, or who actually thinks that because of his driving experiences he can safely disregard warnings and warning signs in obviously hazardous circumstances, cannot escape liability under the guest statute by establishing that in so doing he did not think that this conduct would probably (as distinguished from possibly) produce the precise result that it did produce and would bring harm to his guests.

■ In determining the defendant's intent or state of mind in guests statute cases, this court has adhered to the so-called "external standard" since the Melby case was decided in 1936. Using this external standard, the defendant's mental attitude is established not by what he said nor even by what he may actually have thought, but rather by the attitude that an ordinarily prudent person would have had under all the attending circumstances. Espeland v. Green, 74 S.D. 484, 54 N.W.2d 465; Stevens v. Stevens, 355 Mich. 363, 94 N.W.2d 858.

■ The defendant strenuously argues that the fact that he was unfamiliar with the road negates any inference that he was guilty of wilful and wanton misconduct. However, we are unable to distinguish any difference between knowing of danger by reason of personal observations and knowing of danger by reason of prior warnings. In this connection, the warnings become important, not because they were disregarded, but because they gave the defendant knowledge of dangerous conditions ahead. Ignored warnings make a stronger case for wilful and wanton misconduct

when the driver is unfamiliar with the road than when he personally knows the road conditions ahead.

■ Viewing the evidence in a light most favorable to the plaintiff, as we are required to do, we believe that the evidence presents a jury question on the issue of whether or not the defendant's conduct constituted wilful and wanton misconduct.

Here the defendant, on a dark and rainy night, was driving on a sloshy, gravel detour road with which he was unfamiliar. He disregarded and ignored the warnings of a guest who was familiar with the road, disregarded the warning signs and the red flags and operated his car at a speed of at least twice the posted speed limit. His conduct under the totality of the circumstances as they existed that night justified the trial court in submitting the case to a jury on the issue of wilful and wanton misconduct. Defendant's conduct in this case is reasonably comparable to the conduct described in our prior cases of Wentzel v. Huebner, 78 S.D. 481, 104 N.W.2d 695, and Minick v. Englert, supra.

We are of the view that this case is illustrative of the court's statement in Allen v. McLain, supra:

"* * * it is not simply the failure to negotiate one turn or the single item of speed but the whole attitude of the defendant and all of the circumstances and conditions confronting him at the time of and prior to the accident which make reasonable a finding of probability as distinguished from possibility of accident resulting from his conduct."

In so determining, we do not suggest that the defendant's conduct constituted wilful and wanton misconduct as a matter of law. Under the facts of his case, we would not have been disposed to have set aside a verdict for the defendant. Neither are we disposed to set aside plaintiff's verdict.

The jury verdict for the plaintiff allowed him damages of $400,000, and the defendant asserts that this amount is excessive and seeks a new trial under SDCL 15-6-59(a) (5).

When the defendant's car struck the bridge, a piece of two-inch angle iron went through the car door, entered plaintiff's body at or slightly below his right hip, exited at his left buttocks and went into the car seat about a foot. The extent of the injury was not immediately apparent, but became apparent when an effort to pull the car away from the bridge resulted in pain to the plaintiff. When it was discovered that the plaintiff was impaled on this angle iron, a welder was summoned to the accident scene and he cut the angle iron away from the bridge. The car was then pulled from the bridge and the cutting torch was used to cut the hinges from the car door, so the door could be taken off the car and the plaintiff could be removed. The plaintiff was then taken to the hospital in an ambulance with the 30-inch section of angle iron through his body. It took about three hours after the accident to get the plaintiff to the hospital. The plaintiff was conscious during this period and was given two shots of Demerol for his pain.

At the hospital the plaintiff was given a general anesthetic. About 5 a. m. the angle iron was removed from his body and it was discovered that the angle iron had cut off the lower part of the plaintiff's rectum and did extensive damage to the sphincter muscle. A colostomy and a cystostomy were then performed. Plaintiff's hip and right leg were badly broken. About three weeks after the accident the plaintiff's right leg was amputated high in the hip area at the site of the break because of gangrene infection. At the time of trial this stump had not yet healed completely. The plaintiff also had surgery on his left kidney to remove kidney stones. The right kidney was removed because of stones and associated infection caused by obstruction of a chronic nature. The injury also resulted in adrenal destruction and the plaintiff was placed on a cortisone treatment which will have to be continued for the rest of his life.

The plaintiff had six major operations performed on him and six or seven minor operations for the removal of tubes and the like. He received about 95 blood transfusions. He was hospitalized continuously from April 1, 1967 to the date of trial, November 18, 1968. At the trial his doctor estimated that he would be hospitalized for another four to six months.

After recuperating sufficiently to permit his release from the hospital in Mitchell, the plaintiff will require another month or six weeks of hospitalization in connection with the fitting of an artificial leg.

At the time of the trial the plaintiff had incurred a hospital bill in excess of $37,000, which figure included $7,700 in drugs and medicines. His doctor bill to the time of trial was in excess of $2,000, the special nurses expense was $1,300. In addition, it was obvious that the plaintiff was certain to require very substantial additional outlays for medical expenses in the future.

The plaintiff at the time of the accident was an 18-year-old college student, maintaining slightly over a "B" average in his college studies and was in excellent health.

Because of the plaintiff's extensive injuries, adrenal destruction and kidney complications, his doctor's prognosis for a satisfactory recovery was "guarded" at the time of trial.

■ The test employed by this court in determining when damages are excessive within the meaning of SDCL 15-6-59(a) (5) is contained in Schuler v. City of Mobridge, 44 S.D. 488, 184 N.W. 281:

> " 'The damages, therefore, must be so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line; for they have no standard by which to ascertain the excess.' "

This is also the test used in most jurisdictions. 22 Am.Jur.2d, Damages, § 366, p. 473.

This obviously creates an extremely difficult burden for anyone attempting to overturn a verdict on the ground of excessive damages. But the reason for the rule is sound. The jury and the trial judge have seen the plaintiff and noted his manner of testifying, his intelligence, his physical con-

dition, and have heard first hand the testimony on the subject of damages. The appellate court does not have this opportunity and, therefore, is not in as good a position to accurately assess the plaintiff's damages.

The trial judge in passing upon the reasonableness of the jury verdict has had the benefit of not only hearing and observing the same things as the jury, but also has had the opportunity to observe the jury itself for signs of passion and prejudice, in addition to considering the amount of the verdict. Weidner v. Lineback, 82 S.D. 8, 140 N.W.2d 597.

■ The jury's verdict in this case is very substantial, but so are the injuries and the resulting damage to the plaintiff. We have reviewed the amounts awarded in other reasonably similar cases as collected in 11 A.L.R.3d 9 and 12 A.L.R.3d 475. Reviewing these cases, and bearing in mind the declining value of the dollar, pursuant to Ross v. Foss, 77 S.D. 358, 92 N.W.2d 147, we are not persuaded that this verdict is excessive under the Schuler rule.

We have examined the defendant's other assignments of error and find them without merit.

The judgment is affirmed.

HANSON and BIEGELMEIER, JJ., concur.

HOMEYER, J., dissents.

RENTTO, J., concurs in dissent.

JONES, Circuit Judge, sitting for ROBERTS, P. J., disqualified.

HOMEYER, Judge (dissenting).

No member of the court has been more critical of the guest statute than I. In my opinion it is a legal monstrosity. Nevertheless the legislature saw fit to enact it originally and then to retain it despite attempts to repeal it at nearly every legislative session during the last decade. Consequently it is our duty as judges to apply the law not in accord with our personal feelings on the matter but as it has

been written by the legislature and interpreted in prior decisions.

Starting with Melby v. Anderson (1936), 64 S.D. 249, 266 N.W. 135, and continuing through Minick v. Englert, 84 S.D. 73, 167 N.W.2d 551, this court has said the phrase "willful and wanton misconduct" used in the statute means something more than negligence. It means conduct from which it can be said the wrongdoer **consciously realized that it would in all probability, as distinguished from possibility,** produce the precise result which it did produce and bring harm to the plaintiff. In essence we have held it is the equivalent of culpable negligence. State v. Bates, 65 S.D. 105, 271 N.W. 765; Espeland v. Green, 74 S.D. 484, 54 N.W.2d 465.

In Chernotik v. Schrank, 76 S.D. 374, 79 N.W.2d 4, we said conduct which is wanton and wilful is more akin to an intentional tort than to negligence. There must be an element of **deliberate recklessness.** In **Espeland,** in reaffirming the principle of the guilty mind expressed in State v. Bates, supra, the court said "if we removed the essential of the guilty mind in guest cases as it is determined by the external standard of the reasonably prudent person, and as it exists in the wilful exposure of a defendant to a **probability** that harm will result, we would be destroying the line of demarcation between negligence cases and cases involving wilful and wanton misconduct."

Separating the wheat from the chaff, these facts and circumstances appear. The defendant was unfamiliar with the road and had never traveled over it before. The plaintiff knew it well, having been over it many times and in fact, in daylight on the day of the accident. He knew of the signs, speed limit, and narrow bridge.

The detour for the first mile east was a graveled county highway, and the second mile south to where the accident happened, was a graveled township highway. It was a much used road. The main traveled part was at least 23 feet wide. There was no posted speed limit on the detour. The only speed limit sign was about 600 feet from the right curve sign, towards the bridge, and the numbers were partially obliterated. There was no speed limit shown on the right curve sign.

Defendant did not take this route going to Loomis and there can be little doubt the decision to travel this road to Mitchell resulted from plaintiff's actions since he was the only one who knew about the road.

The speed estimates were not too far apart. Plaintiff said defendant was going 50 to 60 miles per hour as they entered the curve and defendant said it was from 40 to 50 miles per hour. Under either estimate it was not any great speed.

The so-called warnings were little more than ordinary conversation informing a driver of a temporary travel route. The first one during the first mile south of Loomis, consisted of the statement "they would have to slow down, there was a detour there and we'd have to turn". The turn was made and they traveled east one mile and the defendant was driving satisfactorily. Certainly to this point there could be nothing which by any stretch of imagination could be considered wilful and wanton misconduct or even ordinary negligence.

They turned south; the bridge and accident scene were about ¾ mile from this turn. Approximately ¼ mile north of the curve sign plaintiff said: "I stated there was a curve and that the bridge was at a bad angle in the road." A little farther on before the curve sign he said, "you will have to slow down." The curve sign showed a right curve. Later, "We were in the right hand curve, approaching the left hand curve when I said he would have to slow down". About that time the car went off the shoulder. The car was then out of control.

The road curves gradually to the right for about 1000 feet from the curve sign and then turns sharply to the left at a point about 200 feet from the bridge. There was no left hand turn sign and it is undisputed plaintiff did not warn of any left hand curve or a speed limit sign.

Using plaintiff's maximum speed estimate and applying it to the travel distance before the defendant lost control of the car, the time span of the warnings and failure to heed on which the majority largely relies to establish wilful and wanton misconduct covers approximately 26 seconds.

Little significance should be attached to the red flag testimony. Quite obviously they were put up to mark the detour route and not as danger signs. The county highway superintendent said it was common or standard procedure to mark all detour routes with red flags. Most of the witnesses arriving at the scene of the accident did not even see them.

There is no evidence of intoxication. Drinking four cans of 3.2 beer over a 4-hour span and none during the last hour or so, would have little effect.

The record shows the right curve sign which defendant says misled him was replaced after the accident and a new speed limit sign was also put up.

The whole atmosphere preceding the accident seems to me to dispel **deliberate recklessness.** Here were three fraternity brothers driving to town for a hamburger. The plaintiff himself was drinking from a can of beer shortly before the accident and visiting. This does not indicate apprehension over the manner in which the car was being driven. Likewise, it does not constitute the "thrill ride" or "drag racing" atmosphere from which wilful and wanton misconduct has sometimes been inferred.

In Berlin v. Berens, 76 S.D. 429, 80 N.W.2d 79, we said if a verdict were permitted in that case we in effect would be obliterating "the difference between conduct that is negligent and misconduct which is willful and wanton". It appears to me this is what the majority has done in this case. As we said in Mitzel v. Hauck, 78 S.D. 543, 105 N.W.2d 378: "The standard has been fixed by the legislature and courts are bound by it."

I see little similarity between the factual situation here and in Minick v. Englert, supra. In **Minick** the defendant was an engineer in charge of the construction where the accident occurred. The bridge was out and the road barricaded. He drove through the barricade and into the excavation. We said:

"It appears from the facts and circumstances of this case that defendant entered into an area of dan-

ger without heeding warning signs and a barricade across the highway of which **he had actual knowledge.** There was no obstruction or impairment of visibility and no reasonable excuse for defendant's **failure to see the signs and the approaching hazard.** Defendant concedes that it was his responsibility as an engineer and employee of the state to require contractors on the project to provide and maintain necessary detours and to erect and maintain signs to warn travelers of unsafe places on the highway under construction and that he had **actual knowledge** of the detour and the warning signs which had been so provided by contractors." (Italics mine)

The foundation for the **Minick** decision was actual knowledge of the danger and a deliberate disregard of danger by one possessing such knowledge. I might add the recitation of facts in that case treated the defendant's misconduct charitably.

The accident itself might be termed a freak accident. Although defendant may have been negligent in driving too fast under the circumstances and momentarily lost control of the car on a soft shoulder he nearly regained control and averted the accident. The car was almost stopped and except for the protruding angle iron, there perhaps would have been no injury, or no serious injury, and minimal damage to the car. Defendant and the other guest passenger were not injured. Compare this with fact situations in Wentzel v. Huebner, 78 S.D. 481, 104 N.W.2d 695, and Minick v. Englert, supra, where verdicts in guest cases were sustained.

RENTTO, J., concurs in dissent.