BYRE, Respondent v. WIECZOREK, Appellant

(217 N.W.2d 151)

(File No. 11139. Opinion filed April 25, 1974)

Charles Rick Johnson, Johnson & Johnson, Gregory, Sam Masten, Canton, for defendant and appellant.

J. L. Morgan, Morgan & Fuller, Mitchell, for plaintiff and respondent.

WINANS, Justice.

This action in tort for damages against the defendant because of a battery against plaintiff on May 10, 1969 is before us for the second time. The first trial resulted in a verdict in favor of plaintiff, and upon appeal, this court in its reversal limited the issues to be tried to actual damages. The second trial on the issue of damages again resulted in a verdict for the plaintiff, this time in the sum of $60,000. The appeal is from the judgment and the order denying the motion for new trial. The fact situation surrounding the tort is set forth in this court's prior judgment, the case being recorded in 85 S.D. 645, 190 N.W.2d 57.

The evidence in brief shows that plaintiff was 38 years of age at the time of the injury; that he had served four years and two months in the U.S. Coast Guard, having been released in 1956 and thereafter engaged in the ranching business; that while in the Coast Guard he received a student's license to pilot an airplane and that in 1954 or 1955 he received his private license.

As a private pilot he would have the privilege of hauling passengers but not for hire. As a student pilot he could operate an airplane by himself but could not take passengers. In 1958 he obtained his commercial license, permitting him to charge for services as a pilot, flying passengers for hire or spraying crops. Thereafter and prior to being injured, the plaintiff had passed the written examination and had received part of his flight instruction for instrument rating but did not have sufficient hours to take his flight check ride. He had attended ground schools in Huron and Winner, South Dakota, and had attended a seminar on instruments in Sioux Falls, South Dakota, given by the Federal Aviation Agency or Administration out of Oklahoma City, the agency licensing pilots in this country. Having passed the written examination in December of 1968, he had been preparing for the flight test..

By 1959 he had started commercial activities by flying mostly chartered planes, mainly for people in and around Chamberlain. In 1963 he received his flight instructor rating, following which he occasionally instructed students. During most of this time he was operating his farm and ranch. In 1963 the plaintiff flew aerial surveys for the State Game, Fish and Parks Department, making such surveys every year until he was grounded by his injuries received at the hands of the defendant. The state paid him at the start $15 per hour for the airplane and his services as pilot. As the years went on and right at the last, they had raised it to $20 per hour, the amount he received each year varying from $2000 to $8000. In 1967 and 1968 plaintiff was aerial spraying, being paid by the acre and averaging about $1.25 per acre which included the cost of both the material used and the airplane. To become an aerial applicator, plaintiff passed a test given by the South Dakota Department of Agriculture which required knowledge in the use of chemicals and in the difference in chemicals and how to mix them, and included a written test on such knowledge. In addition the plaintiff did charter and instructional work and earned as a pilot, if the student had his own plane, from $5 to $6 per hour, and in addition from $12 to $17 per hour for the rent of his planes.

In 1967 plaintiff acquired a Cessna 150 trainer plane and a Mooney Mark 21 aircraft for chartering and rental, which he kept at the Chamberlain airport where he was office manager. In 1967 he and his uncle had four planes, a Cessna 180, an Aeronca Champ, in addition to the above two planes of plaintiff's. During all of this time, in addition to his flying, he operated the farm or ranch in Lyman County. In 1968 he was notified of the intention to sell the place he was renting. He continued to care for his cattle until March of 1969.

Early in 1969 he entered into an employment agreement with Mr. Wieczorek, defendant in this action, to fly a Gruman Ag Cat plane, a highly special crop-spraying plane, to do aerial spraying, at $500 per month plus a 10% commission on the fertilizer applied. On May 10, 1969 at Huron, following some angry words between them, defendant struck the plaintiff on the left side of the face, breaking his jaw, pulling plaintiff's coat over plaintiff's head and putting an armlock on him. Plaintiff was

flown to the Chamberlain hospital and placed under the care of Dr. Holland. In addition to the injured jaw plaintiff also had a cut on his right eye, bruises and abrasions, a split over the top of his ear and a bruised shoulder and back.

Dr. Robert Loos, a Chamberlain dentist, was called in to wire plaintiff's jaws together. The plaintiff was hospitalized eight days, and required to suck food through his teeth during the six weeks his jaws were wired, resulting in a weight loss of 22 pounds. The plaintiff began noticing dizziness, ringing in his ears, headaches, loss of balance especially in the dark, and dizziness when riding in or driving a car.

In August or September of 1969 Dr. Holland advised plaintiff he could return to work if it were in some type of office or in a garage as a parts man or something of that sort. After being unsuccessful in securing such employment the plaintiff purchased a hay grinder in December of 1969, grossing $1,034.85 during that season. Plaintiff went to work for Speckels in 1970 as a carpenter's helper at $3.00 per hour with the understanding that he could not work at heights, his gross earnings amounting to $2,758.50 for that year. That fall plaintiff returned to hay-grinding, grossing $3,037.50 in that season. In the summer of 1971 he worked as an equipment operator for Kent Brothers Construction, grossing $3,546.04. During this employment he suffered with dizziness while operating the equipment. After an unsuccessful attempt to sell the hay-grinding equipment, the plaintiff returned to grinding, grossing $2,699 in the 1971 season. Since that time plaintiff has sold the hay grinder and has entered the dairy business in partnership with his father. Plaintiff's share of the monthly milk check has been approximately $430 and $450 per month.

Prior to working for the defendant the plaintiff had flown approximately 7,200 hours including approximately 1000 hours of instructional work and approximately 500 hours of aerial spraying. He had also been active in the Flying Farmers Organization, serving as president in 1968 and 1969. He was voted the Airport Operator of the Year in 1968 and the Flying Farmer of the Year in 1969. However, after the injury the plaintiff could not qualify for the medical certificate required by the Federal Aeronautics

Agency and, according to the testimony of the two FAA medical examiners, the plaintiff could not pass such a medical examination.

The medical evidence submitted at the trial was that plaintiff incurred a broken jaw, a sprained shoulder, small lacerations of the external canal of the left ear and a cerebral concussion. This resulted in tinnitus (ringing in the ear) and vertigo (dizziness sometimes resulting in nausea). The vertigo condition was labeled as chronic labyrinthitis with two examining physicians testifying as to its being permanent. Chronic labyrinthitis was caused by an injury to the inner ear, according to Dr. Gregg's testimony, in plaintiff's case resulting in a hearing loss of 15% in the left ear or 1% on the whole man concept.

Shortly before commencing the second trial on February 2, 1972 the plaintiff amended his complaint as a second amended complaint in which plaintiff Byre claimed hospital and medical expenses in the amount of $896.52, loss of earnings of $37,000, and hearing loss, broken jaw, permanent partial injury to the inner ear, pain of body and mind past and future, and loss of future earnings and earning capacity of $150,000. After both parties had rested their case, plaintiff amended the second amended complaint by alleging general damage in the amount of $250,000 for those particular losses claimed in the second amended complaint in the sum of $150,000.

The defendant in his appeal has asserted error under five assignments which in general are as follows: (1) Adverse ruling by the court regarding Byre's past earnings loss, (2) Admission of certain hypothetical testimony bearing upon Byre's earning capacity, (3) Insufficiency of the evidence to justify the verdict, (4) Error of the trial court in refusing to allow a new trial because of newly discovered evidence, (5) The judgment entered by the trial court was contrary to the evidence and the law applicable thereto.

In his brief defendant states, "Because the assignments of error in this case are so closely related they will be argued under a single point. It is appellant's primary contention on this appeal that the lower court took an erroneous approach to the issue of what Byre's past loss of earnings were up to the time of trial."

Under this first assignment of error defendant argues that the court confused "loss of earnings" with "loss of earning capacity". In this connection he quotes the comment to Pattern Jury Instructions, Civil, No. 30.07:

"Occasional confusion has resulted between two distinct factors of damage: (1) loss of earnings suffered up to the time of trial, and (2) detriment to be suffered in the future from loss of earning capacity. This instruction deals with the former, while the following instruction (30.07-1) deals with the latter. The latter need not be specially pleaded since it is an element of general damages. Allen v. Martley, 77 S.D. 133, 87 N.W.2d 355. However, loss of earnings must be specially pleaded and is capable of fairly definite and certain proof. Simmons v. Leighton, 60 S.D. 524, 244 N.W. 883."

Simmons v. Leighton, supra, is not authority for the statement that loss of earnings is capable of fairly definite and certain proof. It is authority for the following statement regarding proof:

"Assignments of error 4 and 5 relate to the admission of evidence bearing on the loss of earnings. Plaintiff, a dentist, testified that his average monthly net income during the year preceding the accident was $350. In actions of tort where the quantum of damages is largely within the discretion of the jury, plaintiff may testify to his average earnings, not on the ground of its furnishing a measure of damages to be adopted by the jury, but to aid the jury in estimating a fair and just compensation for being prevented by the injury from engaging in his work or occupation. Bankers' Mortgage Bond Co. v. Sproull, 220 Ala. 245, 124 So. 907; New Jersey Express Co. v. Nichols, 33 N.J. Law 434, 97 Am. Dec. 722; Comstock v. Conn. R. & Light. Co., 77 Conn. 65, 58 A. 465; Murdock v. N. Y. & Boston Despatch Express Co., 167 Mass. 549, 46 N.E. 57; Chicago, R. I. & P. R. Co. v. Stibbs, 17 Okl. 97, 87 P. 293; 3 Sutherland on Damages (4th Ed.) § 1246. In Quarnberg v. City of Chamberlain, 29 S.D. 377, 137 N.W. 405,

410, the plaintiff was permitted over objection to testify to the average net profit from his mill, and this court held: 'It is competent to prove average net earnings as a basis upon which the jury may estimate loss of profits. City of Terre Haute v. Hudnut, 112 Ind. 542, 13 N.E. 686. The testimony as to net profits in an established business is competent, subject to the right of defendant's counsel to cross-examine as to all matters which may affect the question of profits.' There is no essential distinction between the admissibility of evidence of net earnings of plaintiff in his profession and that of net profits in a business."

■ Allen v. Martley, supra, is authority for such statement and further, is authority for the definition of the difference between loss of earnings and earning capacity, and the following from Martley establishes our rules regarding their differences and proofs necessary to show them:

"Loss of earning capacity is one of the natural and necessary consequences of a disabling injury. As an element of general damages it need not be specially pleaded. It differs from loss of earnings which involves a past loss, must be specially pleaded, and is capable of fairly definite and certain proof. Simmons v. Leighton, 60 S.D. 524, 244 N.W. 883. What a person has earned in the past 'is an element which may throw light on what he would have been able to earn in the future had his ability to work not been destroyed by the injury. That, however, is not the measure of his loss but only evidence which may aid the jury in determining its extent.' Shaw v. Pacific Supply Co-operative, 166 Or. 508, 113 P.2d 627, 628.

"The purpose of an award of damages for loss of future earnings is 'to compensate for loss of earning capacity as distinguished from loss of actual earnings * * *.' Renuart Lumber Yards v. Levine, Fla., 49 So.2d 97, 99. As the Oregon court stated in the case of Shaw v. Pacific Supply Co-operative, 166 Or. 508, 113

P.2d 627, 628, 'there are no precise rules by which to measure such a loss in every case, that it can only be' approximated, and that the question is peculiarly one for a jury, to be determined in view of the facts proven and in accordance with their common knowledge and experience; though the evidence, of course, must furnish a basis for the determination.'

"Ordinarily loss of earning capacity is shown by proof of what the party earned before the injury and what he is capable of earning after the injury. Brown v. Sutkowski, 117 Vt. 377, 91 A.2d 556. However, 'with respect to loss of earning capacity as distinguished from loss of earnings, past earnings are only one of the factors to be taken into consideration, and other factors are a plaintiff's age, condition, station in life, occupation, health and surroundings * * * and may be determined even in the absence of testimony as to plaintiff's earnings prior to the accident.' Hrabak v. Hummel, D.C., 55 F.Supp. 775, 779, affirmed 3 Cir., 143 F.2d 594, certiorari denied 323 U.S. 724, 65 S.Ct. 57, 89 L.Ed. 582."

In the former case of Byre v. Wieczorek, 85 S.D. 645, 190 N.W.2d 57, 59, this court stated that

"The principle allowing damages is that of compensation, the ultimate purpose being to place the injured party in as favorable a position as though no wrong was committed. On the other hand, no rule of law should permit an injured party to receive more than has been lost as a result of some tortious act. Adams v. Deur, Iowa, 173 N.W.2d 100, 105. Another factor to be considered is the occupation in which plaintiff was engaged, that of crop spraying by airplane. Courts are mindful of this being an activity having a greater than average danger of accident and consequent injury or death which would shorten or limit plaintiff's future earnings."

Loss of earnings, which involves a past loss capable of fairly definite and certain proof, must be given a reasonable

interpretation and also must take into consideration factors such as whether the injured party is an employee on a straight salary or salary and commissions or whether the party injured is one engaged in business. We quote partially from 22 Am.Jur.2d, Damages, § 97, which is headed, "Persons engaged in business.":

"How far compensation for injury to one engaged in business may include the value of his services in such business must depend upon the nature and extent of the business, the amount of his personal direction and labor in connection with the business, and the amount of capital invested and labor employed. One may recover any pecuniary loss sustained by reason of the suspension of his personal direction of, and attention to, his business during his absence on account of his injuries, and because of his decreased ability to give it such direction and attention after he returned to work and in the future. If the business could not be continued with the same success after his injury as before, a fair compensation may be made for loss of his earning power if it can be fairly and approximately measured. This compensation should not exceed the amount usually paid to persons performing similar services for others, and care must be taken not to make the responsible party an insurer of prospective profits.

"In the case of a person engaged in business, from the very nature of the situation, the amount of loss cannot be proved with exactitude, and all that can be required is that the evidence, with such certainty as the nature of the particular case may permit, lay a foundation which will enable the trier of facts to make a fair and reasonable estimate. It is competent and proper to show the nature and extent of the business and the part the plaintiff transacted therein, the pecuniary loss sustained by reason of the partial or total absence of his personal attention and labor, and what his services in the business were worth, the compensation paid to persons doing such business for him, and, under some circumstances, what the injured person's services were worth if employed under like circumstances by another in a similar capacity."

Again in 22 Am.Jur.2d, Damages, § 91, it is stated:

"There is no single method of proving the value of plaintiff's lost time prior to trial. It is impossible to state one rule for all cases, because of the differences in the background and occupations of plaintiffs prior to injury. For example, in a particular case, the plaintiff may have been unemployed at the time of injury, he may have been working for profits, or he may have been employed on a commission basis or at a stated wage or salary—or he may have been working on some combination of these plans. Each case requires a different method of proof in estimating the value of the time lost prior to the trial, because of the injury. The basic test, however, involves a determination of what the plaintiff's services would have been worth during the time he was incapacitated by the injury, considering the income (if any), health, age, education, and background of the plaintiff. But although specific items of evidence will vary from case to case, the value of the lost time must be proved with reasonable certainty, so that the jury will not have to base an award on mere speculation. If the reviewing court, after considering the evidence, believes that the jury's verdict covering the loss of plaintiff's time prior to the trial was based upon speculation, the court will not sustain the verdict.

"If the plaintiff was employed at the time of the injury, his earnings—either immediately prior to the injury, or, in an appropriate case, averaged over recent years—are evidence of the value of his lost time. The plaintiff must establish a reasonable probability that his injury did bring about a loss of time, must afford a basis for a reasonable estimate of the amount of that loss, and to this end must prove both the amount of the time lost and its value. Plaintiff's gross wages, and not his 'take-home' pay, are used by the courts to establish this value."

In our case defendant desired to interrogate the plaintiff upon certain business records, particularly his income tax returns

for a number of years. Regarding income tax returns, it should be observed that the plaintiff's returns were based upon his farm income, his aviation income, and were really in the nature of business returns which took into account inventory, depreciation, etc., and these were ruled out by the court. In Olson v. Aldren, 84 S.D. 292, 170 N.W.2d 891, 895, this court said:

"The trial court received as evidence Olson's federal income tax returns for the years 1962, 1963 and 1964. Attached to each such return was a Schedule F, Form 1040, Farm Income and Expense, showing gross income from dairy products and from some other sources, farm expenses, depreciation, and other information usually contained in income tax returns of farmers. The returns do show some decline in dairy product gross income in 1964 from 1963, but in our opinion the many variables reflected in income tax returns of farmers from year to year make such evidence highly speculative and insufficient to sustain an award for loss of profits. Differences in weather, feed supply, costs of operation, and prices, in general, are such as to give little probative value to an income tax return for the purpose of showing a loss of profit. In our opinion they should not have been received in evidence in this case."

We think the court correctly ruled on that matter for the same reasons.

In Domeracki v. Humble Oil & Refining Co., 3 Cir., 443 F.2d 1245, the court there gave much the same rule and for much the same reasons in measuring damages. Quoting from that case at page 1249, as follows:

"Our analysis begins with the elementary rule of damages in personal injuries actions: a plaintiff should be compensated (1) for monies of which he has been deprived and which presumably he would have received had he not been injured, including wages and earnings, past and future; and (2) for the expenses, inconveniences, and suffering which have been thrust upon him by virtue of his injuries. The purpose, then of personal

injury compensation is neither to reward the plaintiff, nor to punish the defendant, but to replace plaintiff's losses.

"Insofar as wages are concerned, an injured plaintiff loses only his net or take-home pay, that is his gross earnings, less taxes. He does not in fact 'lose' his gross earnings. Nevertheless, in the three states and one territory of this Circuit, as in most jurisdictions, the courts hold that the gross earnings of the plaintiff, rather than net earnings after taxes, are admissible as evidence for the jury's consideration in calculating this item of damages. Thus, the jury is presented not with evidence of wages which plaintiff has actually lost, but sums which, in fact, may be considerably higher depending upon his particular income tax bracket."

We also note from an examination of the record in this case that on Monday, February 7, 1972 at 9:30 A.M., plaintiff's attorney withdrew all of his former objections "made to the offer of the income tax returns, not agreeing that any of these matters are material or proper, but so that the defendant may reoffer". This was at a time when the plaintiff was being adversely examined and such income tax returns for the years 1964, 1965, 1966, 1967 and 1968 were offered and received, which returns were the returns for the plaintiff and his wife, and in addition the return for 1968 included the Byre Aviation, Inc. In addition Exhibit 9 was offered. All of these exhibits were then received and went to the jury. We find no error on this assignment.

By his next assignment of error the defendant asserts that the trial court's admission of certain hypothetical testimony based upon plaintiff's earning capacity was erroneous. This has to do with the testimony of Walter Ball, Harold Creager, Bernard Horstman and the deposition of Cecil Ice, all of them being plaintiff's witnesses. Walter Ball, Harold Creager and Cecil Ice are all men of considerable experience in the flying business.

Dealing briefly with their testimony, Mr. Ball answered a hypothetical question giving the flying experience of the plaintiff and stating that such a pilot, in his opinion, would earn about

$10,000 a year and that 25¢ per acre is paid for spraying. Harold Creager, an aerial sprayer from Kennebec, testified that a pilot is paid 25¢ per acre for spraying. Cecil Ice indicated that he pays his pilots $12,000 per year. These men were all expert in their field and they were testifying as to work the plaintiff was well qualified to do except for his injuries and had done before being injured. They testified as to the earning capacity of a pilot. In Kramer v. Sioux Transit Co., 1970, 85 S.D. 232, 180 N.W.2d 468, this court said:

> " 'The propriety of allowing hypothetical questions rests largely in the discretion of the trial court, and, where such questions are allowable, it is the duty of the trial court to see that they are properly framed, that they are responsive to the issues in question, and that they assume only such facts as are supported by some evidence in the record. Whether such facts have been actually proven is a question for the jury to decide. But the party framing such questions should be allowed a fairly wide latitude, so long as he keeps within reasonable bounds as to his theory of the case and the evidence supporting such theory. The opposing party has the right to rebut the facts assumed, as well as the testimony of the witness.' " (Dean v. Seeman, 42 S.D. 577, 176 N.W. 649)

We do not believe the court abused its discretion in any manner in allowing this testimony.

■ In the former case of Byre, supra, we stated that the prospective value of the dollar and expected interest rates are factors to be considered in a damage action. Mr. Horstman was called as an actuarial witness for the plaintiff. After he stated his qualifications, background and experience, plaintiff's counsel stated to him:

> "Now, I'm going to use some figures and some years, and you understand, Mr. Horstman, and the jury should understand, that this is only for the purpose of illustration as to the use of the table and not necessarily your opinion as to the rate of interest that the jury may ap-

ply the number of years or the amounts; do you understand that?"

Previous to that the attorney had stated to Mr. Horstman: "I'm going to let you use Exhibit 13, which has just been admitted into evidence and is an actuarial table showing the present value of one dollar per year payable at the end of each year for the specified numbers of years, and I think I have furnished you a copy of that table before". Exhibit 13 is Figure No. 12 in the Appendix to the American Jurisprudence Proof of Facts, Annotated, Vol. III which is a table showing present value of $1 per year, payable at the end of each year for a specified number of years. By its use it is possible for a jury instructed in its use to figure the commuted or discount value when figuring the present allowance for loss of earnings in the future. That was the purpose of the evidence and defendant should have no objection because it, if used properly, will reduce the plaintiff's award. We find no error in this.

■■■ The defendant next attacks the sufficiency of the evidence. In Byre v. Wieczorek, supra, we stated the rule as follows:

"When the sufficiency of the evidence to support a verdict is challenged the court must view the evidence in the light most favorable to the successful party and he should have the benefit of every reasonable inference that can be drawn therefrom, Peters v. Hoisington, 72 S.D. 542, 37 N.W.2d 410. SDCL 15-6-59(a)(5) provides as a cause for which a new trial may be granted, 'Excessive or inadequate damages appearing to have been given under the influence of passion or prejudice'. The test to be employed in determining that question is contained in Schuler v. City of Mobridge, 44 S.D. 488, 184 N.W. 281, and quoted in Brewer v. Mattern, 85 S.D. 356, 182 N.W.2d 327, 332-333, as:

' "The damages, therefore, must be so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by pas-

sion, partiality, prejudice or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line; for they have no standard by which to ascertain the excess." ' "

As in the former case we find the award is a substantial one. However, two separate juries hearing this case have each made a substantial award to the plaintiff. The first trial in Brule County yielded a verdict for plaintiff of $54,000 plus. We reversed that verdict. This trial was changed from Brule County to Davison County where the award was even substantially higher than the first. However, we believe the evidence submitted supports it and it can not be considered unreasonable nor outrageous nor such as to manifestly show the jury to have been actuated by passion, partiality, prejudice or corruption. We have heretofore in this opinion set forth much of the evidence in minuscule form. We are mindful that the plaintiff had qualified himself for highly skillful work, and we believe he is entitled to base his loss of future earnings on that.

■ The defendant's next assignment is based upon the trial court's refusing to allow a new trial because of newly discovered evidence. Applications for a new trial are covered in SDCL 15-6-59(a). This application is made under (4) of the above section which reads: "Newly discovered evidence, material to the party making the application, which he could not with reasonable diligence have discovered and produced at the trial;". A motion for a new trial is addressed to the sound discretion of the trial court and the court's decision in granting or refusing the same will not be disturbed upon appeal by the appellate court unless it appears affirmatively from the record that there has been an abuse of such discretion. We do not find any such abuse. The rule that must be applied by the trial court in disposing of a motion for a new trial is stated in 58 Am.Jur.2d, New Trial, § 25:

"The guiding principle is that although a verdict ought not to stand which is tainted with illegality, there ought to be but one fair trial upon any issue, and that parties ought not to be compelled to try anew a question once disposed of by a decision against which no illegality can be shown."

Quoting from Museus v. Geyer, 75 S.D. 381, 66 N.W.2d 63, 1954, this court quoting further from an earlier case, Gaines v. White, 1 S.D. 434, 47 N.W. 524, stated:

> " 'The application must not only show that the new evidence was discovered too late to have been used at the trial, but that it was of such a nature, or so concealed, that it could not have been, by the use of reasonable diligence, discovered and produced at the trial. If new trials were legally granted in cases like this, the interests of society would be injuriously affected, and the administration of justice greatly disturbed. The adverse party is entitled to have an end put to the litigation, and his legal rights finally established. The good of all, society and litigants, requires that a party should be diligent in securing not part but all, of his evidence, in order that one action may settle the controversy. If lax rules were to prevail, then great delays, and protracted and vexatious litigation, would be the consequence. If a defeated litigant could obtain a second trial upon the ground of newly-discovered evidence without a strong, clear, and satisfactory showing of diligence, of the materiality of the evidence, and of the probability that it would change the result, there would be a temptation to great wrongs, and such a procedure would lead to grave abuses.' "

The last assignment of error by the defendant is that the judgment is contrary to the evidence and the law applicable thereto. In our foregoing discussion we have shown this is not true.

For all of the reasons herein, we hold that the trial court ruled correctly in denying defendant's motion for a new trial and the judgment of the trial court is

Affirmed.

All the Justices concur.

HANSON, Retired Justice, sitting for DUNN, J., disqualified.